Commonwealth *v.* Guida, Appellant.

Argued November 25, 1929. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*Harry E. Grim,* with him *Howard I. James,* for appellant.—The evidence is insufficient to sustain a verdict

of first degree murder: Com. v. Marshall, 287 Pa. 512; Com. v. Divomte, 262 Pa. 504.

The intent with which the crime was committed was the vital factor in determining the degree of crime: Delancey v. Little, 4 S. & R. 503; Com. v. Hazlett, 14 Pa. Superior Ct. 352; Bartley v. Phillips, 179 Pa. 175; Com. v. Gormley, 77 Pa. Superior Ct. 298.

Evidence as to the purpose of the payment of the money represented by the check of $500 was improperly excluded: Smith v. Traction Co., 202 Pa. 54.

The dying declarations of decedent were incompetent: Com. v. Lockett, 291 Pa. 319; State v. Martin, 248 Pacific 176.

*Arthur M. Eastburn,* District Attorney, for appellee.

OPINION BY MR. JUSTICE WALLING, January 6, 1930:

This appeal by the defendant, Guiseppe Guida, is from sentence of death on conviction of murder of the first degree. He and John Tillotta were Italians and resided as neighbors in Bristol Borough, Bucks County. Guida, a widower, often visited at Tillotta's and, the Commonwealth's evidence tended to show, became so fond of Mrs. Tillotta that, to possess her, he planned the death of Tillotta. Defendant had a distant cousin, Giaccomo Guicciardo, who resided in Brooklyn, New York, and with whom he exchanged visits. The Commonwealth's evidence is that while this cousin was visiting in Bristol on July 4, 1928, defendant made known to him his fondness for Mrs. Tillotta and wished to get rid of her husband and in effect asked the cousin to find some one to put him away. Giaccomo replied that he knew of no such person. About two months later defendant renewed the subject and in the fall Giaccomo informed him he had found men who would do the job for $500. On November 15, 1928, defendant sent Giaccomo a draft for that amount which he cashed and turned over the proceeds to three men, and on Christmas he came to

Bristol and the defendant took him out onto the Mill Creek Road and showed him a place thereon, some two miles from the borough, where defendant said he would bring Tillotta at a certain hour on Saturday evening, December 29, 1928. On the afternoon of that day Giaccomo and the three men came over from Brooklyn in an automobile, from which the three men alighted at the appointed place and waited until the defendant and Tillotta came up in an automobile, which the men stopped and asked for a rope. In attempting to comply with the request defendant and Tillotta stepped from the car, when the three men set upon the latter and beat him to death, or until he died in a hospital the evening of the next day. Tillotta was bruised and battered almost beyond recognition; his injuries included a badly broken skull and two broken ribs which penetrated the lung and were the immediate cause of death.

At the beginning of the assault the defendant entered his car and drove away and, after inflicting the mortal injuries, the three men reëntered their car, from which Giaccomo had not alighted, and all returned to Brooklyn. Giaccomo was later arrested, but the three escaped. Tillotta made his way to a farmhouse, where he was found on the doorstep later that evening and removed to a hospital. The defendant returned to the borough, left some eggs at Tillotta's home, put his car in a garage, saw people, but said nothing as to what had occurred. The next day he at first denied all knowledge of the assault and said he had left Tillotta in front of his own door. Later, he said he drove his car past the standing car and saw the men who swore at him, but he did nothing. Still later on the same day, he said the men, after getting them to step out of the car, assaulted Tillotta and he (the defendant) was afraid and drove away. Then he took the officers out and showed them the place where the assault occurred. There they found stains of blood, tracks, etc. When the defendant and Mrs. Tillotta were brought together, each accused the other of having

employed Giaccomo to get Tillotta put away. The defendant's $500 draft, put in evidence, strongly indicated that he did the hiring, while his explanation that it was a loan to Giaccomo was not convincing.

Giaccomo, when called as a witness for the Commonwealth, detailed the entire transaction from July 4th to December 29th, inclusive. Of course he was an accomplice, but his testimony was so strongly corroborated as to leave no doubt of its substantial accuracy. By what other means than prearrangement with the defendant could Giaccomo have known where to bring the thugs on the evening of the homicide? It was dark and he remained in the automobile at the time of the assault and there is no claim that defendant saw him that night; yet, when questioned by the officers, defendant referred them to Giaccomo for information about the homicide. This tends to discredit defendant's contention that he had no advance knowledge of what was to occur. There is no proof or even suggestion that Giaccomo had any motive for killing Tillotta except that it was done at the instigation of his cousin, the defendant.

The trial judge repeatedly instructed the jury that to constitute murder of the first degree required a specific intent to kill. This favored the defendant for the statute makes of the first degree all murder perpetrated, as was this, by lying in wait. Again, the nature of the assault and the number and character of the wounds inflicted justified the finding of such intent, whether they were inflicted with or without weapons. The absence of deadly weapons deprived the Commonwealth of the presumption of an intent to kill which their use would have afforded; but it cannot be affirmed as a legal conclusion that an intent to take life is rebutted by the absence of a deadly weapon. Such a conclusion would be unthinkable in a case like killing by strangulation or drowning. True, Giaccomo in one part of his testimony said the intent was merely to beat Tillotta, but he also said the intent was to put him out of the way. As the

trial judge properly ruled, one man could not testify to
the intent of another. It is a general principle that a
party may testify to his own intent where that is an
issue (see Bartley et al. v. Phillips, 179 Pa. 175; Com.
v. Hazlett, 14 Pa. Superior Ct. 352), but not to the in-
tent of another but it may be shown by the latter's dec-
larations (see Com. v. Marshall, 287 Pa. 512), or by his
conduct. The intent in the defendant's mind here, be-
yond peradventure, was to have Tillotta put out of the
way so he could secure his wife. This could not be ac-
complished by a beating, but only by his death. That
being his intention and death resulting from his instiga-
tion, he is guilty of murder of the first degree.

Giaccomo testified that on the morning of July 4th,
the defendant talked with him about employing some
one to put Tillotta out of the way. In answer the de-
fendant testified that he was not with Giaccomo on that
morning and as the former's counsel confined his ques-
tion to that particular time the trial judge thought it
was a sufficient denial, for if they were not together they
could not have had this conversation, and declined to
permit counsel to bring out from the defendant a specific
denial of the alleged conversation. Whether this was a
matter within the discretion of the trial judge we need
not say, for later the defendant testified that he never
talked with Giaccomo about getting rid of Tillotta.

A few hours prior to Tillotta's death on the evening
of December 30th, he was informed by the attending
physician he was about to die, and a fellow countryman
also told him he was going to die. To this he made no
answer, but thereafter made some statements which
were received in evidence as dying declarations. This
was right, for, in addition to what he was told, his condi-
tion was such as to admonish him of approaching dis-
solution. In fact, he was at the time in extremis and
gasping for breath. We have so recently considered the
question of the admissibility of dying declarations (see
opinion of Mr. Justice SADLER, speaking for the court,

in Com. v. Puntario, 271 Pa. 501, 504, 505; also Com. v. Lockett, 291 Pa. 319, 323; Com. v. Barille, 270 Pa. 388; Com. v. Abel, 245 Pa. 220), that an extended discussion thereof here is unnecessary. Wherever the victim of an assault is in a dying condition, and realizes it his statements concerning the cause of his injuries are admissible in evidence. That he is in such condition may be shown by the nature of his wounds and the result thereof. His knowledge may appear from declarations made to or by him. The nature of the wounds is also important as bearing on the injured party's knowledge of his condition: Kehoe v. Com., 85 Pa. 127, 136. As stated in Wigmore on Evidence (2d ed.), volume 3, page 172: "We may avail ourselves of any means of inferring the existence of such knowledge [that the declarant knew he was about to die]; and if, in a given case, the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude." It is not necessary for the declarant to state that his declarations are made under a sense of impending dissolution: Com. v. De Leo, 242 Pa. 510; Kilpatrick v. Com., 31 Pa. 198, 215; Com. v. Winkelman, 12 Pa. Superior Ct. 497, 515. In the face of his condition and the information given him with no hope of recovery expressed by him and his death following the same evening, it may be safely assumed that he realized he was about to die. Hence, the trial judge properly admitted his statements as dying declarations.

We cannot review the rulings of the trial judge on questions of evidence complained of in the first, fourth and sixth assignments of error, as no exceptions were taken thereto. The instruction to the effect that if it was a wilful, deliberate and premeditated murder, committed by lying in wait, it would be of the first degree, was sound.

Defendant's eighth request, viz., "If the jury fails to find from the evidence any motive for the killing of the

deceased by the defendant and is not satisfied from the evidence that the killing was premeditated, the absence of motive may create the reasonable doubt which would prevent a verdict of murder in the first degree," the trial judge did not read, because, as he said, it was sufficiently covered in the general charge. The trial judge had fully instructed the jury on the question of motive and the effect of the absence thereof; also as to premeditation and reasonable doubt. If the defendant instigated the murder and took the deceased to the place arranged for the killing, there could be no proper finding of lack of premeditation. If the defendant was guilty, it was a premeditated murder.

It was no answer to the Commonwealth's case that the defendant bore the deceased no ill will,—not hatred of him but love of his wife prompted the crime. We have carefully examined the entire record and find it discloses every element of first degree murder and is free from any substantial error. The lower court properly refused to grant a new trial.

The judgment is affirmed and the record is ordered remitted for the purpose of execution.