464 A.2d 1236

**COMMONWEALTH of Pennsylvania**

v.

**David E. HUBBLE, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 18, 1982.

Filed July 15, 1983.

Reargument Denied Sept. 19, 1983.

Petition for Allowance of Appeal Granted Feb. 8, 1984.

Robert B. Elion, Williamsport, for appellant.

Kenneth D. Brown, District Attorney, Williamsport, for Commonwealth, appellee.

Before WIEAND, BECK and MONTEMURO, JJ.

WIEAND, Judge:

David E. Hubble was tried by jury and convicted of robbery, burglary, theft, criminal conspiracy and three counts of murder in the second degree.[1] On direct appeal from judgments of sentence, Hubble contends that his inculpatory statement was unlawfully obtained and should have been suppressed. We are constrained to agree. Therefore, we reverse and remand for a new trial.[2]

---

**1.** For a more detailed recitation of the facts surrounding the homicides see this Court's opinions affirming on appeal the convictions of appellant's co-conspirators: *Commonwealth v. Hubble,* 314 Pa.Super. 99, 460 A.2d 784 (1983); *Commonwealth v. Scarborough,* 313 Pa.Super. 521, 460 A.2d 310 (1983).

**2.** In view of our disposition, we need not address appellant's arguments that the trial court erred in 1) denying appellant's request for a continuance; 2) refusing a proposed voir dire question; 3) restricting examination of a witness; 4) denying certain requested points for charge; 5) refusing appellant's motion for new trial based on after-discovered evidence; 6) denying appellant's motion for modification of sentence. We have reviewed the record and find appellant's challenge to the sufficiency of the evidence to sustain the convictions totally devoid of merit.

"When ruling on suppression motions, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of the defendant's constitutional rights. Pa.R.Crim.P. 323(i). The suppression court must determine whether the Commonwealth has established by a preponderance of the evidence that the challenged evidence is admissible. See Pa.R. Crim.P. 323(h). On review, our responsibility is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.' *Commonwealth v. Goodwin*, 460 Pa. 516, 521, 333 A.2d 892, 895 (1975).

"If the suppression court has determined that the evidence is admissible, 'this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted.' *Commonwealth v. Kichline*, 468 Pa. 264, 280, 361 A.2d 282, 290 (1976); see *Culombe v. Connecticut*, 367 U.S. 568, 604, 81 S.Ct. 1860, 1878, 6 L.Ed.2d 1037 (1961) (Opinion of Frankfurter, J.)." *Commonwealth v. Brown*, 473 Pa. 562, 566, 375 A.2d 1260, 1262 (1977).

When so viewed, the record establishes that Claire Kepner and her two small children were robbed and murdered in their home near Muncy in Lycoming County on the evening of August 5, 1976. State Police investigated but did not immediately have any suspects and made no arrests. On or about March 30, 1977, Colin Brown, who had seen and talked with appellant on the night of the murder, told Trooper Shimko that appellant had been a participant in the crime. Brown was placed under hypnosis on March 31, 1977 and again implicated appellant. On April 7, 1977, Shimko arranged to transport appellant, with his consent, to State Police Barracks in Muncy, where he questioned appellant and asked him to submit to a polygraph examination. Appellant consented and signed a written waiver of his *Miranda* rights. After he had completed the polygraph,

appellant was told that he "didn't look very good here." Shimko was also told by the polygraph examiner that appellant was either involved in or had knowledge of the Kepner killings. Although Shimko then proceeded to question appellant further, appellant repeatedly denied involvement in or knowledge of the murders. He was eventually returned to his home and was not questioned again for approximately three months.

On May 16 and 17, 1977, Colin Brown was again questioned and, on the latter date, informed Trooper Shimko that appellant had admitted killing the younger Kepner child. On June 16, 1977, Colin Brown underwent Sodium Amytal analysis and while under the influence of the drug again stated that appellant had admitted killing the Kepner child. On July 6, 1977, appellant was again transported consensually to State Police barracks for further questioning. He arrived shortly after 3:00 o'clock, p.m., and again executed a written waiver of his *Miranda* rights. He was then questioned by Sergeant Peterson and Lieutenant McGlynn until approximately 5:00 o'clock, p.m. Shimko and Peterson then took appellant for a drive around the Muncy area. They passed the Kepner house twice and parked outside. Appellant was asked whether he had ever been there before or if he recognized the house. He denied ever having been to the house previously and continued in his denial of any involvement in the killings. He was returned to the barracks and at approximately 8:00 o'clock, p.m. signed a written consent to allow the State Police to take his palm prints. After this he was taken home.

On July 7, 1977, Shimko interviewed appellant's wife, Virginia Hubble, who told Shimko she thought that appellant and she had been fishing with another couple on the evening of August 5, 1976. Near the end of the interview Mrs. Hubble said that her husband had told her of having been threatened by his brother, Robert Hubble, on the evening of August 7, 1976 at the Step Inn and warned not to discuss the Kepner murders with anyone. Shimko told Mrs. Hubble that he would meet her and her husband at the

Lycoming County Courthouse the next morning to discuss the August 7, 1976 incident with appellant. Appellant had been subpoenaed as a prosecution witness in a burglary case against his brother and was scheduled to testify on the morning of July 8, 1977. During questioning in the District Attorney's office that morning, appellant informed Shimko that Robert had admitted involvement in the murders to him and had threatened him with death if he told anyone. Three days later Trooper Shimko again telephoned appellant and arranged to transport him to the State Police barracks for further questioning on the following morning. When Troopers Shimko and Zaremba arrived at appellant's home shortly after 9:30 o'clock, a.m., on July 12, 1977, appellant requested that his wife be permitted to accompany him, and the police agreed. At the barracks, appellant once again signed a waiver of his *Miranda* rights and agreed to submit to another polygraph examination. The polygraph examination was completed at approximately 11:00 o'clock, a.m. Trooper Jones, who had conducted the test, informed appellant that the test indicated he had been lying about not participating in the murders. Trooper Jones then left appellant in his office and informed Trooper Shimko that, based on the test results, he believed appellant had been involved in the murders and that Jones "had him in the house." Shimko then informed Virginia Hubble, who was in another office being questioned by Trooper Zaremba, that appellant was probably involved in the killings and requested her assistance in eliciting information from appellant.

Jones and Shimko had known appellant for several years prior to 1977 and were aware that appellant, who had progressed only as far as third grade in a special education class, was dull witted. Indeed, the suppression court found that appellant possessed a "borderline retarded mentality."[3] At or about 11:30 o'clock, a.m., Shimko returned to

---

**3.** Appellant's expert testified that appellant had a verbal IQ of 72 and a performance IQ of 99 for a full scale IQ of 83. The Commonwealth's expert witness testified that his tests indicated a verbal IQ of 79, a performance IQ of 99 and a full scale IQ of 87.

Jones' office where appellant had been waiting and resumed interrogation, with appellant's wife present. He told appellant that the test had indicated he was lying and that he either had knowledge of or had participated in the crime. Shimko continued his questioning of appellant until shortly before 2:00 o'clock, p.m., at which point he became visibly angry as a result of appellant's continued denials that he had been involved. He yelled at appellant and told him that he knew he was involved in the crime and was lying, and then stormed out of the room. Shimko returned approximately 15 minutes later and apologized for losing his temper. He then resumed his questioning of appellant, not about his participation in the slayings, but with respect to his brother's statements concerning the murders; and he asked appellant if he would agree to give a statement on tape regarding Robert's statements. Virginia Hubble spoke before appellant responded and suggested to her husband that he obtain a lawyer before giving any further statements. Appellant thereupon requested a lawyer. Appellant testified that the trooper responded, "I can't give you a lawyer. You're not charged with nothing." Shimko testified that appellant first requested a lawyer and then requested a public defender. The trooper told appellant that a public defender would probably not come out to talk with him because he had not been arrested, but that he could call whomever he wished. Appellant then asked for permission to call Attorney Jack Felix.[4] Shimko looked up Attorney Felix's telephone number for appellant and permitted appellant to dial the number. Felix, however, was not available, and appellant then requested permission to call his probation officer, David McCool. When appellant reached Mr. McCool, he explained that he was being questioned at the State Police barracks, wanted an attorney and that he had been unable to reach Attorney Felix who was

---

**4.** Attorney Felix had served as the Lycoming County Public Defender from June of 1970 until March or April of 1976 and had once represented appellant while serving in that office. It is not clear from the record whether appellant was aware that Attorney Felix had resigned from that position.

out of town. Appellant asked McCool if the Public Defender's office would represent him while he was being questioned. McCool told appellant that he wasn't sure whether the Public Defender's office would represent him since he had not been arrested but suggested that appellant call the Public Defender's office and ask. Appellant then hung up the phone and spoke for a short period of time with his wife. Shimko again asked appellant if he would give a taped statement, and this time appellant agreed. He gave a taped statement concerning the statements allegedly made to him by his brother Robert. The taped statement concluded at approximately 2:45 o'clock, p.m. Shimko left appellant in Trooper Jones' office and went into the hallway to speak to Virginia Hubble. He told her he believed that her husband had participated in the murders and that if appellant had anything further to say he should contact Shimko. Shimko and appellant's wife then returned to Jones' office where Shimko repeated to appellant his conversation with Virginia and informed appellant that he would take him home if he so desired. Appellant requested permission to speak to his wife privately, and Shimko left the two of them alone in Trooper Jones' office. During the next forty-five minutes Shimko looked in on them several times and asked them what they wanted to do. Each time they requested that they be able to continue their conversation privately. At approximately 3:45 o'clock, p.m., Sergeant Peterson and Trooper Shimko entered Trooper Jones' office and began speaking with appellant and his wife. Peterson testified that when he entered Trooper Jones' office he "told Dave that there was an individual that we had talked with who told us that at the time of the crime David was in the car, David went into the house with Bob and Milt.... And exactly basically what this individual had told us as far as David's participation in the crime." Appellant's wife then interrupted and gave an account of the events of the evening of August 5, 1977, which incriminated appellant, his brother Robert and Milton Scarborough. Shimko said that her statement was an accurate account of the crime. Mrs. Hubble explained that she had pieced the story together

after "sitting there listening to conversations that Trooper Zaremba and Trooper Shimko had been having with her and Dave that day...." Appellant again denied that he had participated in any way in the murders and again asked to speak with his wife privately. Approximately one-half hour later, Peterson and Shimko re-entered the room, without being requested to do so by either appellant or his wife. Sergeant Peterson again began questioning appellant, and approximately five minutes later asked appellant, "Now, Dave, were you or weren't you in the house?" Appellant then "broke down and stated that he was." Following his oral confession, appellant gave a taped confession from 5:45 o'clock, p.m. until 6:30 o'clock, p.m. The District Attorney was contacted and, upon Shimko's request, agreed to defer appellant's arrest until after Robert Hubble's preliminary hearing. Shimko then took appellant and his wife to her parents' home where he explained to her parents the events of the day and requested that they permit appellant to stay with his wife at her home until he was formally arrested. Appellant was arrested a month later on August 3, 1977.

 The suppression court held that appellant had been subjected to custodial interrogation on July 12, 1977 for *Miranda* purposes and that the investigating officers had engaged in interrogation and conduct calculated to or likely to evoke admissions. We agree with these legal conclusions. They are based upon the court's findings of fact and are amply supported by the record. See: *Commonwealth v. Chacko,* 500 Pa. 571, 577–80, 459 A.2d 311, 314–316 (1983); *Commonwealth v. Brown, supra* 473 Pa. at 570, 375 A.2d at 1264; *Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713, *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974); *Commonwealth v. Yount,* 455 Pa. 303, 309, 314 A.2d 242, 245–246 (1974); *Commonwealth v. Romberger,* 454 Pa. 279, 283, 312 A.2d 353, 355 (1973), *vacated,* 417 U.S. 964, 94 S.Ct. 3166, 41 L.Ed.2d 1136 (1974), *reinstated on remand,* 464 Pa. 488, 347 A.2d 460 (1975); *Commonwealth v. D'Nicuola,* 448 Pa. 54, 57, 292 A.2d 333, 335 (1972); *Commonwealth v. Simala,* 434 Pa. 219, 223–225,

252 A.2d 575, 577–578 (1969); *Commonwealth v. Banks,* 429 Pa. 53, 58–59, 239 A.2d 416, 419 (1968). The suppression court determined further that appellant had been adequately advised of his right to appointive counsel and that he had voluntarily and knowingly waived his right to such counsel. We are bound by the court's findings of fact where, as here, they are supported by the record. However, "we are of course not bound by the lower court's conclusions of law.... *See e.g., Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980); *Commonwealth v. Webb,* 491 Pa. 329, 421 A.2d 161 (1980); *Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980); *Commonwealth v. Williams,* 287 Pa.Super.Ct. 19, 429 A.2d 698 (1981)." *Commonwealth v. Lapia,* 311 Pa.Super. 264, 280, 457 A.2d 877, 885–886 (1983).

■ "The general rule is that once an individual is given the *Miranda* warnings and wishes to exercise any of those rights, all interrogation must cease. *Commonwealth v. Nahodil,* 462 Pa. 301, 341 A.2d 91 (1975); *Commonwealth v. Youngblood,* 453 Pa. 225, 307 A.2d 922 (1974); *Commonwealth v. Mercier,* 451 Pa. 211, 302 A.2d 337 (1973); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)." *Commonwealth v. Scarborough,* 491 Pa. 300, 313, 421 A.2d 147, 153 (1980). See also: *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979); *United States v. Hinckley,* 217 App.D.C. 262, 672 F.2d 115, 122 (1982); *Commonwealth v. Nathan,* 445 Pa. 470, 475, 285 A.2d 175, 177 (1971); *Commonwealth v. Frison,* 301 Pa.Super. 498, 508, 448 A.2d 18, 23 (1982). Shimko's testimony explained the circumstances surrounding appellant's request for counsel as follows:

"A. Ginny, Virginia turned to Dave and says, 'Dave, I think you better get a lawyer.'

Q. What did he say?

A. He said, 'I want a lawyer.'

Q. A lawyer?

A. 'I want a lawyer.'

Q. Any in particular? Did he mention the public defender?

A. He mentioned the public defender a short period of time later, yes.

Q. What did he say about a public defender?

A. He said, 'I want a public defender.'

Q. What did you say to him when he said he wanted a lawyer or a public defender?

A. At this particular time I said to Dave—

Q. Excuse me. I'm sorry. When he said 'I want a lawyer,' did you make any response to that?

A. It's after he stated 'I want a public defender' is when I made the response to him.

Q. What was your response?

A. My response to Dave at this particular time was, 'Dave, you can call whoever you want to call. I do not believe that a public defender will come out to talk to you because you were not arrested. We are not accusing you of any crime. We're talking about what Bob had told you. This is all we're concerned with at this particular time, but you are willing or you're able to call whoever you wish to call.'

. . . .

Q. What was Mr. Hubble's response to what you said?

A. Mr. Hubble said, 'I want to call Mr. Felix.'

. . . .

Q. Did you give a phone book to Mr. Hubble so that he could look up the number?

A. I believe I looked the phone number up for Mr. Hubble.

Q. Of Mr. Felix?

A. Of Mr. Felix.

Q. Did Mr. Hubble dial the phone for Mr. Felix?

A. Yes, he did.

Q. Did he reach somebody at the other end?

A. He talked to his secretary.

Q. Were you listening in?

A. I was listening from my side.

Q. You heard Mr. Hubble's side of the conversation?

A. Yes.

Q. Go ahead. What did you hear?

THE COURT: You weren't listening in on the phone?

THE WITNESS: No, no. I was listening to the conversation that Mr. Hubble was having. Mr. Felix was not in at that particular time.

BY MR. BANKS: (Continuing)

Q. Was that the impression you got?

A. That is the impression I received.

Q. Did Mr. Hubble say anything at that point?

A. He just hung the phone up.

Q. Did he make any more calls?

A. Yes.

Q. Why?

A. Mr. Hubble then said he wanted to talk to his probation officer, Dave McCool. He then reached into his wallet and pulled out Mr. McCool's telephone number from the inside of his wallet and called that particular telephone number. This was the home phone of Mr. McCool.

Q. What time was this?

A. Shortly before the tape was given. I would say approximately 10, 15 minutes beforehand.

Q. Did he reach Mr. McCool?

A. He reached Mr. McCool at home.

Q. Did you get the impression he was talking with Dave McCool?

A. Yes.

Q. How long did he talk to Mr. McCool?

A. A matter of two, three minutes.

Q. When he hung up did Mr. Hubble say anything to you or to Trooper Zaremba?

A. Mr. Hubble then conferred with Ginny for a period of between three to five minutes, that range. I again asked Mr. Hubble at that time whether or not he wished to give me a taped statement. At that time he stated he would."

The United States Supreme Court held in *Edwards v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378 (1981), *reh. denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), "that when an accused has invoked his right to have counsel present during custodial interrogation, a *valid waiver* of that right *cannot* be established by showing only that he responded to further police-initiated custodial interrogation *even if* he has been advised of his rights." It held further "that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication exchanges or conversations* with the police." (footnote omitted) (emphasis supplied). See also: *Wyrick v. Fields,* 459 U.S. 42, 45–6, 103 S.Ct. 394, 395, 74 L.Ed.2d 214, 217 (1982). The defendant in *Edwards* had been arrested at his home on charges of murder, robbery and burglary and had been taken to the police station where he was informed of his rights as required by *Miranda.* He agreed to submit to questioning and was told that another individual already in custody had implicated him in the crime. Edwards denied any involvement and gave a taped statement consisting of an alibi. He then indicated that he wished to "make a deal" but stated that he wanted an attorney before making the deal. All questioning immediately ceased. The next morning two officers came to the jail to speak with Edwards. Edwards told the guard he didn't wish to see anyone, but was told by the guard that he had to meet with the officers. The officers identified themselves and in-

formed Edwards of his *Miranda* rights. Edwards indicated that he was willing to talk with the officers but asked first to hear the taped statement of the individual who had implicated him. After listening to the tape, Edwards said he would tell the officers anything they wanted to know as long as it was not taped. He then confessed. The Arizona Supreme Court held that Edwards' waiver and confession had been voluntarily and knowingly made. The United States Supreme Court, reversing the Arizona Supreme Court, observed that "the voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries. Here, however sound the conclusion of the state courts as to the voluntariness of Edwards' admission may be, neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. It is thus apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel, once invoked." *Edwards v. Arizona, supra* 451 U.S. at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378.

In the instant case, appellant, who had a borderline retarded mentality, requested counsel to assist him during questioning. He was told that the Public Defender would not respond to a request for assistance because appellant had not been arrested and was not being accused of a crime. This, despite the fact that on several prior occasions he had been told that he was entitled to counsel before answering any questions and that if he was unable to afford counsel, one would be appointed to represent him free of charge. It was also said despite the fact that police believed appellant to have been a part of the killing. It was, at best, misleading to tell him that he was not a suspect. In fact, Colin Brown had already identified appellant as a participant in the murder of Mrs. Kepner's children and had told police that he heard appellant admit involvement. The police, moreover, had repeatedly told appellant that his denials of

involvement were lies and that they had a witness who could testify regarding his participation.

The United States Supreme Court has expressly held that "a valid waiver of [the right to counsel] *cannot* be established by showing only that [the defendant] responded to further *police-initiated* custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona, supra* at 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (emphasis supplied). See also: *United States v. Hinckley, supra* 672 F.2d at 122; *Commonwealth v. Youngblood, supra* 453 Pa. at 232–234, 307 A.2d at 926–927; *Commonwealth v. Mercier, supra* 451 Pa. at 215–216, 302 A.2d at 340; *Commonwealth v. Nathan, supra* 445 Pa. at 475–476, 285 A.2d at 177–178; *Commonwealth v. Frambro,* 230 Pa.Super. 220, 224, 326 A.2d 436, 437 (1974); *State v. Fuentes,* 433 A.2d 184, 191 (R.I.1981); *Vaughn v. State,* 248 Ga. 127, 132, 281 S.E.2d 594, 597 (1981). The record in this case establishes beyond peradventure of a doubt that after appellant had clearly and unequivocally invoked his right to counsel and after he had attempted, unsuccessfully, to reach counsel by telephone, he was questioned further by Trooper Shimko. That he responded to such police-initiated questioning does not establish a waiver of the right to counsel previously invoked. "For a waiver ... to be effective, the reversal of the defendant's position *must* have been initiated by him." *Commonwealth v. Frambro, supra,* 230 Pa.Super. at 223, 326 A.2d at 437, quoting *Commonwealth v. Mercier, supra* 451 Pa. at 216, 302 A.2d at 340 (emphasis supplied). Here, it was not appellant who, after asserting his rights, indicated a desire to waive them without further activity on the part of the police. Instead, it was the police who initiated the chain of events which culminated in appellant's inculpatory statement. This was improper. Appellant had requested and was entitled to have counsel present. His statement given in response to police questioning and without counsel should have been suppressed.

The judgment of sentence is vacated, and the case is remanded for a new trial. Jurisdiction is not retained.