480 A.2d 1160

**COMMONWEALTH of Pennsylvania**

v.

**John J. PETRINO, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1984.

Filed July 20, 1984.

Petition for Allowance of Appeal Denied Jan. 17, 1985.

14

16

Lawrence A. Kalikow, William J. Fulton, Assistant Public Defenders, Harrisburg, for appellant.

Katherene Holtzinger, Deputy District Attorney, Harrisburg, for Commonwealth, appellee.

Before WICKERSHAM, DEL SOLE and MONTEMURO, JJ.

DEL SOLE, Judge:

Appellant was convicted of murder in the third degree and theft by unlawful taking. Post-trial motions were filed and denied. He appeals on several grounds.

The facts are as follows: On June 15, 1981, Appellant left the Coatesville Veteran's Administration Hospital in Chester County, Pennsylvania after a voluntary commitment one month before. Appellant had a history of both voluntary and involuntary institutional commitments. While hitchhiking west near Lancaster, Pennsylvania, Appellant was given a ride by William Porter. The two men stopped at the Congress Inn in Lower Swatara Township in Dauphin County. They had been drinking and, after obtaining a room, they went into an adjoining tavern where they met Wilbert Potter, a homosexual in his early fifties. At about 1:30 a.m. on June 16, the three men returned to the hotel room with one case of beer and continued drinking. At approximately 3 a.m., the body of Wilbert Potter was found in the parking lot of the Brookside Diner, just south of the Congress Inn and about 50 yards from the room the three had occupied earlier. The death was found to be caused by a blow to the back of the head by an immovable object, such as cement paving. At 4 a.m., Appellant was seen by a police officer walking north on the Boulevard near where the victim's body was discovered. When the officer questioned him, Appellant gave his name as John Petrino and said he was staying at the Congress Inn. The officer then asked Appellant to return to the Inn. Less than an hour later, police responded to a report of a man trying to hitchhike on the Pennsylvania Turnpike at Exit 19, one mile from the Inn.

The man gave his name as Charles Archking, but one of the officers, who was called to the turnpike, knew him to be the same man who had earlier identified himself as John Petrino. The Appellant, when asked about using two names, smiled. Appellant told police that a person staying in Room 50 of the Congress Inn could identify him. Police, taking Appellant, went to the room and woke William Porter. Upon seeing Appellant, Porter accused him of stealing his (Porter's) shirt and money. When the Appellant then took the money out of his pocket and handed it to Porter, police noted stains on the shirt which appeared to be blood. The shirt was taken for evidence.

Later on June 16, Appellant asked for an attorney before speaking to police. Because the hotel room (where the theft occurred) and the Diner (where the body was found) were located in two separate police jurisdictions, Appellant's request to the Swatara Township Police was not passed on to the Lower Swatara Police. When he was later interrogated on June 16 by representatives of *both* departments, Appellant responded that he had beaten Potter to death and knew he was dead because of his experience as an Army medic. This statement was suppressed at trial.

On June 18, however, police again questioned defendant. At that time, a waiver form was given to Appellant, which he signed. At that meeting, Appellant implicated Porter in the murder and denied his own involvement.

On June 24, while being processed after his arrest at the Dauphin County Prison, Appellant asked one of the investigating officers if he wanted to know the events of June 15 and 16, to which the Detective responded, "Oh, yes." Appellant effectively withdrew his June 18 statement by admitting that it was he and not Porter who had killed the victim. The Detective testified that his comment had not been intended to elicit a response. Appellant was also reported to have stated that the police couldn't convict him for the murder because "he was crazy".

It is apparent from the record that Appellant was not given the benefit of representation until July 13, 1981, when

the Appellant's counsel signed a notice of formal arraignment on behalf of his client.

The main issues raised on appeal are:

(1) Whether the evidence was sufficient to support a finding of guilty of murder in the third degree.

(2) Whether the Suppression Court erred in denying his omnibus pretrial motion to suppress both physical evidence and statements made by Appellant.

(3) Whether the trial court erred in failing to suppress all statements made by Appellant after he requested counsel but before counsel was made available to him.

■ The first issue raised is whether the evidence was sufficient to support a finding of guilty of murder in the third degree. In particular, Appellant argues that the Commonwealth failed to prove that the circumstances of the death would enable the jury to infer malice necessary to justify a verdict of third degree murder. Malice is defined as "a particular ill-will ... a hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty," *Commonwealth v. Buzard*, 365 Pa. 511, 516, 76 A.2d 394, 396 (1950). Where there is no murder weapon, but where only fists are used, there is no presumption of malice, *Commonwealth v. Guida*, 298 Pa. 370, 148 A. 501 (1930). Instead, malice can be found from considering the circumstances surrounding the acts, *Commonwealth v. Buzard*, 365 Pa. at 516, 76 A.2d at 396.

The test in reviewing the sufficiency of the evidence is: Whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt, *Commonwealth v. Moore*, 488 Pa. 361, 363, 412 A.2d 549, 550–51 (1980).

■ In *Commonwealth v. Buzard*, supra., the court refused to overturn a conviction based on a finding of malice from a death occurring when a large defendant pursued a

smaller victim, overpowered him, threw him to the ground and knocked his head against the pavement repeatedly. Also, in *Commonwealth v. Moore,* supra., under similar facts, the requisite malice was found to exist. The Supreme Court noted evidence that the victim suffered from head injuries and rib fractures and internal hemorrhaging while the defendant was only injured in the hand. In the present case, there is evidence of a similar one-sided fight in that the defendant suffered only slight hand injuries and the victim was beaten about the head, abdomen, and limbs. Also, there was evidence admitted at trial from a crime reconstruction expert who testified that the blood stains on the shirt worn by Appellant would indicate that they came from the victim of a severe beating. Given the nature of the injuries along with the circumstances surrounding the act, malice could well be inferred. We find the argument meritless.

Appellant next argues that the Suppression Court erred in denying his omnibus pretrial motion to suppress both physical evidence and statements made by Appellant. The contention is that Appellant's very arrest was illegal and, therefore, the objects and the i.e. the fruits of the arrest, are suppressible. The turning question is whether Appellant was arrested at the time he was taken in a police vehicle to the Inn or whether the arrest occurred at the Inn when he was identified by Porter as the man who stole his shirt and money. Probable cause necessary for an arrest is charged to be lacking before Porter's identification. "An arrest may be constructive or actual ... and is accomplished by 'any act that indicates an intention to take a person into custody and subjects him to the actual control and will of the person making the arrest," *Commonwealth v. Romeri,* 314 Pa.Super. 279, 460 A.2d 1139 (1983). In the *Romeri* case, defendant voluntarily went with police to the station and answered questions resulting in his implication in a crime. Because the defendant chose to follow police to the station, the voluntary statements formed the basis for probable cause and were properly admitted. In this in-

stance, Appellant was approached by police as he stood at the Turnpike entrance. Appellant was seen by police attempting to hitchhike. He was then questioned as to his identity. Appellant is not arguing that the stop itself was unlawful. "A police officer may in an appropriate manner approach such a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest," *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). When an officer observes or has been notified of a person's peculiar behavior and experience dictates that a crime may have occurred or is about to occur, he is in justified in questioning the individual *Commonwealth v. Greber,* 478 Pa. 63, 67, 385 A.2d 1313, 1316 (1978). After Appellant was questioned, however, he told police that someone in Room 50 of the Congress Inn could identify him. The police then took Appellant about one mile in a squad car to the Inn. Appellant argues that this act amounted to an arrest for which police had no probable cause. All parties agree that probable cause for arrest existed when Porter implicated Appellant after the police had transported him to the Inn. This case is distinguishable from the facts which existed in *Commonwealth v. Allessie,* 267 Pa.Super. 334, 406 A.2d 1068 (1979), where police, acting on an informant's tip, blocked defendant's car, read him his rights and escorted him to the station. The court found that an arrest had occurred at the scene. Defendant had requested to drive his own car, and the police refused. He was searched and given his rights. The court said:

An arrest cannot be disguised by the use of such terms as "investigatory detention" ... when a person is actually restrained of his freedom by the police and is taken into custody, an arrest has occurred in law and in fact and constitutional protections must be observed," *Commonwealth v. Allessie,* 267 Pa.Super. at 338, 406 A.2d at 1070.

■ In *Commonwealth v. Sheridan*, 292 Pa.Super. 278, 437 A.2d 44 (1981), this Court approved such an intermediate response. See also, *Commonwealth v. Daniels*, 280 Pa.Super. 278, 284, 421 A.2d 721, 724 (1980). In that case, police had been given a description of a burglar which fit the defendant. Defendant was seen walking in close proximity to the scene at an early hour of the morning. When the defendant was unresponsive to police questions, they frisked him and took him to the scene to be identified. Given the Appellant's evasiveness in this case, i.e. giving a false name, time of the day, proximity to the scene of a brutal murder, police attempts to secure an accurate identification of Appellant were justified. We do not have circumstances here similar to those in *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982), U.S. cert. den. 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983), where police stopped and questioned three men, based on a general description, and, being suspicious of the mud on their shoes as well as dissatisfied with their responses to questions, transported the men to the scene where they were identified by the burglary victim. The time when the men were put into the police vehicle was seen as the time of arrest. The court found that to be an unlawful intrusion into the individual's rights. But in this case, the Appellant was not taken back to the scene per se. He was then not suspected of the murder. Appellant, under the facts, was asked to properly identify himself. He *volunteered* the name and whereabouts of a person who could identify him. He went with police to the Inn and was implicated by that person. While this court is mindful that such intermediate responses are lawful only in narrow instances and that the transporting of individuals is very pursuasive of the fact that an arrest has occurred, such a response was lawful here. There is no evidence that Appellant would not have been free to go after he was properly identified or that he was forced to accompany police. Because the response was both necessary and justified, the physical evidence and oral statements obtained at the Inn which formed the probable

24

cause required to arrest Appellant were properly admitted using this rationale.

The Suppression Court in this case found that Appellant's statements made on June 16, after he had requested counsel, were excludable from trial. No appeal from this order has been filed. The June 18 and 24 statements, however, were admitted into evidence. This case comes to us on the following level:

When ruling on suppression motions, the suppression court is required to make findings of fact and conclusions of law as to whether evidence was obtained in violation of the defendant's constitutional rights, Pa.R.Crim.P. 323(i). The suppression court must determine whether the Commonwealth has established by a preponderance of the evidence that the challenged evidence is admissible ... On review, our responsibility is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings," *Commonwealth v. Hubble*, 318 Pa.Super. 76, 78, 464 A.2d 1236, 1237 (1983), *Commonwealth v. Goodwin*, 460 Pa. 516, 521, 333 A.2d 892, 895 (1975).

According to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), certain rights, including the right to be interrogated in the presence of counsel, attach to the accused when custodial interrogation begins. Such interrogation is defined as, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The U.S. Supreme Court found interrogation to include more than express questioning, however, and ruled that *Miranda* rights come into play where the "interrogation environment created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination," *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682,

1688, 64 L.Ed.2d 297, 306 (1980), or where there exists "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from suspect," *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–1690, 64 L.Ed.2d at 308. The court in *Innis* found that no interrogation had occurred where defendant told police the location of the murder weapon when two officers, escorting defendant to the police station, commented to one another that it would be terrible if some child would injure himself by finding the weapon if it were located near school grounds. Interrogation under *Miranda,* the court decided, involves certain compulsion beyond that which is inherant in a custody situation, *Innis,* 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307. The officers were not questioning defendant but merely talking between themselves. It is admitted in this case that on June 16, when the officers questioned Appellant and took him to the station, a custodial interrogation occurred. Appellant's rights to be interrogated in the presence of an attorney attached. Because the record indicates that at no time was Appellant released from custody, those rights held firm unless he voluntarily and intelligently waived them.

We now turn our discussion to the admissibility of the June 18 and 24 statements. The rule set forth in *Miranda* which provides the framework for our decision today is that:

(O)nce warnings have been given, the subsequent procedure is clear ... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent," *Miranda,* 384 U.S. at 473–474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723.

■ In the present case, Appellant asserted his *Miranda* right to be interrogated in the presence of counsel. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), reh. den. 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984, the U.S. Supreme Court added that where the defendant, after having been read his rights while at the police station, asked for an attorney and was later told he 'had to' talk with detectives, resulting in his making an incriminating statement, such statements were inadmissible at trial. Noting that the right to counsel involves special safeguards, the Supreme Court held that, "(A)n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police," *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. If Appellant initiated the June 18 meeting with police when he signed the waiver form, then that waiver is a valid relinquishment of his rights if made intelligently and voluntarily, *Commonwealth v. Frison*, 301 Pa.Super. 498, 448 A.2d 18 (1982). However, if the Appellant did not initiate the meeting, his previous assertion of rights must stand. In *Frison*, the defendant was found to have experienced a "change of heart" when he delivered his confession after having earlier denied knowledge of the incriminating incident. The court found that, "(A) defendant's initial exercise of his *Miranda* rights does not foreclose a later waiver of them so long as the waiver is preceeded by a complete explanation of those rights and is clear from the record that defendant's decision to forego those rights was not induced by coercion, however subtle, or a promise of leniency but was voluntary," *Frison*, 301 Pa.Super. at 508, 448 A.2d at 23. The court found that because defendant was given an explanation along with his *Miranda* rights when he decided to confess, there was no coercion. The case, however, involved a defendant's right to remain silent. This case deals directly with an assertion of the right to be interrogated in the presence of counsel.

The U.S. Supreme Court has said that the right to counsel involves special attention, *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

 Based on *Edwards*, what is of import in these cases is whether the accused, after he has initially asserted the right to have counsel present, validly revokes that right. The U.S. Supreme Court has recently explained that the inquiry does not end if the accused initiates further contact with the police once he has asserted his right to counsel. The rule, the court found, was designed to prevent the "badgering" by police of defendants in custody. If the defendant is found to initiate further communication with the police, then *Edwards* is not violated but the court next inquires "whether a valid waiver of the right to counsel and the right to silence has occurred, that is whether the purported waiver was knowing and intelligent and found to be so under the totality of circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities," *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412 (1983). Courts must be cautious in determining whether a defendant has in fact had a "change of heart," as in *Frison* and *Bradshaw*, or whether the police, through subtle pressure, forced him to give up those rights. In *Commonwealth v. Gale*, 315 Pa.Super. 59, 461 A.2d 634 (1983), the Superior Court found that the defendant knowingly waived his right to counsel after he was free on bail between the first interrogation, when he asserted a right to be questioned with counsel present, and the second meeting, when he gave up that right. The court found that defendant was able to consult with his attorney during the interim and understood his waiver, *Gale*, 315 Pa.Superior Ct. 62–63, 461 A.2d at 636. The Appellant, under the present facts, was not released from custody and had requested but did not receive the benefit of counsel between sessions with police. Each of these cases must be taken individually and no per se rules should be adopted, said the U.S. Supreme Court, *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74

L.Ed.2d 214 (1982). In *Wyrick*, when the defendant requested a polygraph exam and stated that he did not want counsel present during the exam, he "initiated" the meeting with police.

█ The U.S. Supreme Court has firmly stated that, "(a) valid waiver of (the right to counsel) cannot be established by a showing only that (the defendant) responded to further police-initiated custodial interrogation even if he has been advised of his rights," *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. The Superior Court, in *Commonwealth v. Hubble*, 318 Pa.Super. 76, 464 A.2d 1236 (1983), using these principles, ruled that the defendant, after he asked for and attempted to contact his attorney, did not waive his right when police had reinstituted questioning. The Court found that since it was the police "who initiated the chain of events which culminated in Appellant's inculpatory statement," after he requested counsel's advice, he was entitled to it, *Hubble*, 318 Pa.Superior Ct. 89, 464 A.2d at 1243. The trial court distinguished *Edwards* and found that the Appellant had waived his right to consult an attorney during questioning. On June 18, Police spoke with Appellant two days after he requested an attorney. They presented him with a waiver form, which he signed. He then delivered one of the statements he seeks to suppress. Even though Appellant's statement may not have been in response to police questioning in particular, the fact that a waiver form was presented to him is persuasive of the fact that it was the police, and not the Appellant, who initiated the meeting. The facts do not indicate that Appellant asked to speak with police. Under *Edwards* and *Bradshaw*, a waiver cannot be valid if the defendant did not initiate the conversation. Police cannot be permitted to avoid Appellant's request for representation of counsel merely by ending the questioning and reapproaching him at a later time with a waiver form in hand. Since it was the police who initiated the "chain of events which culminated in Appellant's inculpatory statement," *Hubble*, 318 Pa.Superior Ct. 89, 464 A.2d at 1243, the waiver is invalid and the June 18 statement must be suppressed.

■ The statement of June 18 was *exculpatory* in nature and so at first glance it would seem to have been harmless error to have allowed the Commonwealth to introduce Appellant's statement that it had been Porter who had killed Potter. However, *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), clearly points out that even an *exculpatory* statement, when offered by the Commonwealth, has the effect of guilt by implication. This *Innis* Court said:

[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [5] from the suspect.

[5] By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda:*

"No distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory". If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilty by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement.' 384 U.S., at 476–477, 16 L.Ed.2d 694, 86 S.Ct. 1602, [at 1628–1629], 10 Ohio Misc. 9, 36 Ohio Ops 2d 237, 10 A.L.R.3d 974.

Id. 446 U.S. at 301, 100 S.Ct. at 1689–1690.

■ We now turn to the admissibility of the June 24 statement. This statement was made at the prison when Appellant was being processed following his arrest. Appellant asked the detective if he wanted to know what had taken place on the 15 and 16 of June to which the officer replied, "Oh, yes." The Appellant then gave the statement. The circumstances are similar to those in *Oregon v. Brad-*

*shaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), where the defendant asked, after asserting his rights to a lawyer, "Well, what is going to happen to me now?" When the Appellant asked the officer if he wanted to know the events of the two-day period, there is little doubt that he was opening a discussion about his case. There is no evidence that an interrogation had been taking place. Nor can an interrogation be inferred from the detective's response. The statement, under the analysis in *Oregon v. Bradshaw*, supra., is voluntary and was properly admitted into evidence.

Because we remand the case on this issue, we find it necessary to deal with the other issues raised by Appellant in order to guide the trial court on remand. They are:

1. Whether the trial court erred in:

 a. permitting the Commonwealth to discover any and all reports relating to the insanity or mental infirmity of Appellant.

 b. granting the Commonwealth's petition for the production of records and other evidence.

2. Whether the trial court erred in allowing the testimony of Dr. Milton Bluitt, D.O. psychiatrist from the V.A. Hospital, in violation of Appellant's patient—physician privilege.

3. Whether the trial court erred in admitting evidence of Appellant's post-arrest request for counsel as evidence of mental competence.

The trial court did not err in permitting the Commonwealth to discover any and all reports relating to the insanity or mental infermity of Appellant or in granting the Commonwealth's petition for the production of records and other evidence.

The Commonwealth, faced with the probability of proving defendant's sanity beyond a reasonable doubt, *Commonwealth v. Scarborough*, 491 Pa. 300, 421 A.2d 147 (1980), first requested that Appellant agree to a competency exam. That request was met by Appellant's refusal and assertion of his rights under 50 P.S. § 7402(e)(3) Mental Health

Procedures Act. The Commonwealth then sought and received from the V.A. Hospital records pertinent to Appellant's case on or before June 15, 1981. The Commonwealth requested from Appellant copies of past medical records and reports prepared by Appellant's expert psychiatrists. This request was also refused, and the Commonwealth filed a discovery motion under Pa.R.Crim.P. 305(C)(2)(a). The trial court granted the order after the Commonwealth offered proof that the information was both material and the request reasonable and that the Appellant had sought and obtained reciprocal discovery under Pa.R.Crim.P. 305(B)(1)(e). Portions of the reports, however, were deleted by the court.

The Commentary to Rule 305 states that:

In order to provide adequate information for informed pleas expedite trials, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, the adversary system, and national security.

 Under Pa.R.Crim.P. 305(C)(2)(a), such reports are, under the trial court's discretion, discoverable. The Appellant argues that the Commonwealth in the first instance was not entitled to the reports because they are testimonial in nature, and, as such, violative of Appellant's rights against self-incrimination. Secondly, the Appellant argues that the reports obtained directly from the V.A. Hospital were properly obtainable through discovery. We find both arguments meritless. The Commonwealth obtained the reports directly and the Appellant exercised rights to discover them from the Commonwealth. At any rate, these reports were discoverable at the court's discretion. We will not disturb that use of discretion here.

 Appellant's second argument is that the testimonial nature of the expert's reports removes them from the scope of discovery. We find no merit to this claim. The Appellant cites *Commonwealth v. Pomponi,* 447 Pa. 154, 284

A.2d 708 (1971) and *Commonwealth v. Hale,* 467 Pa. 293, 356 A.2d 756 (1976), as authority that psychiatric reports are protected by the 5th Amendment because their testimonial origin affects defendant's self-incrimination rights. We agree with the trial court that these cases are clearly distinguishable on the facts. Those cases involved situations where the defendant was examined by a Commonwealth psychiatrist which was not so under the present facts. Also, the court reviewed such reports and removed the portions judged to be testimonial in nature and which would threaten Appellant's rights. In *Commonwealth v. Ruth,* 309 Pa.Super. 458, 455 A.2d 700 (1983), this Court was confronted with a very similar situation. The court refused to allow such a limited interpretation of Rule 305— that all such reports were "mental" examinations and should be excluded from discovery. Finding that the trial court had edited portions of the reports, as in our case, the Superior Court allowed the discovery. This Court noted that the defendant could not point to any damaging portions in the transcript, *Ruth,* 309 Pa.Superior Ct. 464, 455 A.2d at 704. The Appellant here has also failed to show specific objections. No error.

■ Lastly, the trial court did not err in allowing the testimony of Dr. Bluitt, D.O., a psychiatrist from the V.A. Hospital. Appellant argues that the psychiatrist's testimony should be excluded on the basis of privileged communications between patient and psychologists. The law which Appellant cites is 42 Pa.C.S.A. § 5944 which creates, in both civil and criminal cases, a privilege against revealing any information gathered from the psychologist-patient relationship. Appellant cites *In re B,* 482 Pa. 471, 394 A.2d 419 (1978) in support of his argument that a psychiatrist's testimony should be included in the privilege with psychologists. The Supreme Court of Pennsylvania in that case found that although the statute itself did not bar the testimony of a psychiatrist about his treatment of the mother in a juvenile proceeding, certain privacy rights in the U.S. Constitution prevented the psychiatrist from testifying. Psychiatrists, under this state's legislative history,

have claimed their privilege under the physician-patient privilege. The older law, 28 P.S. § 328, Act June 7, 1907, P.L. 462, 50 P.S. § 7303(c), was repealed and replaced in 1978 by 42 Pa.C.S.A. § 5929 which states:

No physician shall be allowed in any *civil* matter, to disclose any information which he acquired in attending the patient in a professional capacity, which shall tend to blacken the character of the patient, without consent of said patient, for damages on account of personal injuries, 1976, July 9, P.L. 586, No. 142, § 2, eff. June 27, 1978, (emphasis added).

The previous section was found to apply only in civil cases, *Commonwealth v. Edwards*, 318 Pa. 1, 178 A.20 (1935). Within the civil context, the privilege extended to "communications" and not to "information gathered by the physician in examining the patient," *Massich v. Keystone Coal & Coke Co.*, 137 Pa.Super. 541, 10 A.2d 98 (1939). This being a criminal case, no privilege between physician and patient would apply. We are persuaded by the Commonwealth's argument that this is especially true where Appellant has raised the issue of mental competency. Indeed, the Mental Health Procedures Act, 50 P.S. 7303(c) July 9, 1976, eff. September 9, 1976, specifically requires the testimony of the treating physician or psychiatrist when determining the need for involuntary commitment of an individual. The need can be seen in a criminal case where the defendant has raised the issue of his own insanity, placing the burden on the Commonwealth to prove his sanity beyond a reasonable doubt. See *Commonwealth ex. rel Platt v. Platt*, 266 Pa.Super. 276, 404 A.2d 410 (1979). Appellant claims that the section allowing a privilege in all cases between psychologists and their patients should be applied to psychiatrists. One court has interpreted the section as not applying to psychiatrists, *Miller v. Colonial Refrigerated Transportation, Inc.*, 81 F.R.D. 741 (D.C.Pa.1979). Nowhere in the section is there a reference to psychiatrists. Indeed, the definition section, 63 P.S. § 1201, 1978, does not indicate that psychiatrists have been included in the section on physician—patient privilege.

34

■ We note, however, in allowing the psychiatrist's testimony, that our Supreme Court indicates that the privacy rights must be considered as well. What has emerged in this area is the application of a balance between the public interest in having the person given proper care if needed and the individual's privacy interest in having information regarding his mental state remain confidential, *McKay v. Commonwealth*, 52 Pa.Common. 24, 415 A.2d 910 (1980), *Platt*, 266 Pa.Super. 276, 404 A.2d 410 (1979). In this case, the need for the psychiatrist's testimony in proving Appellant's sanity beyond a reasonable doubt clearly outweighs Appellant's expectations of privacy when he has put the issue before the court.

■ The final issue in this case is whether the trial court erred in allowing the Commonwealth to introduce evidence of Appellant's post-arrest request for counsel to prove mental competence. The Commonwealth urges that the merits need not be decided as the issue waived by Appellant. We agree. Where the use of the evidence has caused prejudice to the accused, unless the court, at the request of the defense counsel, offers curative instructions to the jury, reversal must occur, *Commonwealth v. Humphreys*, 267 Pa.Super. 318, 406 A.2d 1060 (1979), *Commonwealth v. Williams*, 252 Pa.Super. 435, 381 A.2d 1285 (1977). Although the defense counsel objected to the offering of the evidence, when the court suggested curative instructions, the counsel chose not to have the instructions given. This Court said that where instructions could have removed the prejudice to the defendant, "(e)lecting against available relief at trial, Appellant may not now complain of prejudicial error," *Commonwealth v. Quartman*, 253 Pa. Super. 460, 385 A.2d 429 (1978). The trial court, offering the instructions, committed no error.

Judgment of sentence is vacated and the case is remanded for a new trial.

Jurisdiction is relinquished.

WICKERSHAM, J., filed a dissenting statement.

WICKERSHAM, Judge, dissenting:

I would affirm the judgment of sentence on the opinion of the Honorable Warren G. Morgan filed in the trial court below.