545 A.2d 316

**COMMONWEALTH of Pennsylvania**

v.

**Salvador Carlos SANTIAGO, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 16, 1987.

Filed June 27, 1988.

56

Lawrence M. Kelly, New Castle, for appellant.

Thomas W. Minett, Assistant District Attorney, Ellwood City, for Com., appellee.

Before OLSZEWSKI, POPOVICH and WATKINS, JJ.

OLSZEWSKI, Judge:

On September 13, 1985, a jury found appellant Salvador Carlos Santiago guilty but mentally ill of murder in the second degree, robbery, theft by unlawful taking, receiving stolen property, crimes committed with firearms, firearms not to be carried without a license and former convict not to own a firearm. Timely post-trial motions were filed and denied and Santiago was sentenced to life imprisonment. This timely appeal followed.

On appeal, Santiago raises seventeen (17) issues for our consideration:

   I.  Whether the jury verdict of September 13, 1985 is contrary to the evidence?

   II.  Whether the jury verdict is contrary to the weight of the evidence?

III. Whether the pre-trial suppression hearing judge, President Judge Glenn McCracken, Jr., erred when he decreed that the arrest of the defendant was legal, and that the arrest warrant was issued upon probable cause?

IV. Whether the pre-trial suppression judge, President Judge Glenn McCracken, Jr., erred when he decreed defendant's statements to Pittsburgh City Police Detectives, Ronald Freeman and Terry Hedinger and PSP Joseph Holtman and Corporal John P. Wherthey, should not be suppressed as violative of defendant's Fifth and Fourteenth Amendment Rights?

V. Whether the pre-trial suppression hearing judge, President Judge Glenn McCracken, Jr., erred when he decreed that the defendant's taped statement to Pennsylvania State Police Trooper, Joseph Holtman, and Corporal John P. Wherthey, was not a result of delay from arrest to preliminary arraignment?

VI. Whether the trial judge, Francis X. Caiazza, erred when he allowed inflammatory descriptions of the gunshot wounds from the pathologist, which exceeded the bounds of relevancy and were highly prejudicial to Defendant?

VII. Whether the trial judge, Francis X. Caiazza, erred when he allowed the opinion testimony from Pennsylvania State Trooper, Darryl Mayfield, which was not unequivocal and was not within a reasonable degree of certainty.

VIII. Whether the trial judge, Francis X. Caiazza, erred when he allowed the Pittsburgh Police Detective, Terry Hedinger, to testify as to the oral statements of Major Anderson advising defendant of his rights?

IX. Whether the prosecutor/assistant district attorney, J. Craig Cox, after being instructed by the trial judge, Francis X. Caiazza, during cross-examination of Fred P. Gallo, Jr., psychologist, as to the examination of the Defendant to the events of January 15, 1985, surrounding the shooting, again inquired of Dr. Jonathan Him-

melhoch, psychiatrist, as to the events surrounding the shooting, which caused the defense to object, for the same constituted prosecutorial misconduct, since it appeared that the defendant had to exercise his Fifth Amendment Right to remain silent?

X.   Whether the prosecutor/assistant district attorney, Thomas Minnett, committed prosecutorial misconduct in the closing summation to the jury:

A.   When he displayed, demonstratively, the murder scene directly in front of the family of the victim, with the intent to inflame the passion of the jury;

B.   When he made reference that the defense was attempting to divert the jury's attention from important facts of the case;

C.   When he argued that the defense was arguing three (3) to four (4) different defenses, or inconsistent defenses which were illogical and inconsistent, for the defense had argued that the defendant did the shooting but was insane and didn't imply any other defenses;

D.   By the prosecution's reference that the jury could presume specific intent and malice?

XI.   Whether the trial judge, Francis X. Caiazza, erred when he instructed the jury as to defendant's burden of proof as to "legal insanity" by preponderance of the evidence, and mental illness beyond a reasonable doubt which is violative of both Federal and Pennsylvania Constitutions?

XII.   Whether the trial judge, Francis X. Caiazza, erred when he submitted a single verdict slip as to homicide charges, which was misleading?

XIII.   Whether or not the pre-trial suppression hearing judge, President Judge Glenn McCracken, Jr., erred when he permitted the in-court identification of the defendant by James Suttles?

XIV.   Whether the trial judge, Francis X. Caiazza, erred when he allowed district attorney/assistant district attorney, Thomas Minnett, to elicit testimony from the

prothonotary concerning the defendant's prior sentence of incarceration?

XV. Whether the trial judge, Francis X. Caiazza, erred when he allowed the deputy warden, Dominic Farina, to testify as to the defendant's incarceration at the time of trial before the jury?

XVI. Whether the trial judge, Francis X. Caiazza, erred when he precluded evidence from Frankie Mack as to a telephone conversation in the presence of a Youngstown Police Officer on January 15, 1985, where an unknown white male related to her "for $1,000.00 I will give your car back"?

XVII. Whether the trial judge, Francis X. Caiazza, erred when he allowed FBI agents to testify that the defendant had been charged with the Federal offense of Unlawful Flight to Avoid Prosecution?

■ With respect to issues I and II, the record discloses that boilerplate challenges to the sufficiency and weight of the evidence were raised in the post-trial motions. As it is well established that boilerplate challenges to the weight and the sufficiency of the evidence fail to preserve the issues for appellate review, we find that these two issues have been waived. *See Commonwealth v. Holmes*, 315 Pa.Super. 256, 461 A.2d 1268 (1983). Even if we were to find these issues have not been waived, however, we agree with the trial court that these challenges are meritless. *See* Opinion 3/27/87 at 2–7.

With regard to appellant's issues III, V, VI, VII, VIII, IX, X, XII, XIII, XIV, XV, XVI, and XVII, we are persuaded by the reasoning of the Honorable Francis X. Caiazza, and accordingly, affirm on the basis of the trial court's excellent opinion as to these issues. Thus, two issues—IV and XI—remain for our consideration.

■ In issue IV, appellant claims that the inculpatory statements made during questioning by the police were admitted into evidence in violation of his fifth and four-

teenth amendment rights.[1] Before addressing the merits of this claim, we are reminded that upon review of a ruling by a suppression court, an appellate court need only determine whether the record supports the factual findings of the lower court, and question whether the inferences and legal conclusions drawn from those findings are legitimate. *Commonwealth v. Chamberlain*, 332 Pa.Super. 108, 111, 480 A.2d 1209, 1211 (1984). If the suppression court has determined that the evidence is admissible, we will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Chamberlain, supra.*

According to the notes of testimony from the suppression proceedings, Santiago was arrested by FBI agents in Washington, D.C. on April 4, 1985. After being advised of his *Miranda*[2] rights by an FBI agent, appellant invoked his right to remain silent and he requested an attorney. No further questioning took place. On April 5, 1985, counsel was appointed and appellant was arraigned before a United States magistrate on the charge of unlawful flight to avoid prosecution, 18 U.S.C. § 1073.[3]

On April 6, 1985, two detectives from the Pittsburgh Police Department traveled to the facility in Washington, D.C. where Santiago was being held and requested to speak to him. Appellant was advised by an official of the detention facility that the Pittsburgh detectives wanted to question him, but was told that he did not have to speak to the detectives unless he so desired. Appellant expressed a willingness to talk to the detectives and signed a consent form to that effect. Appellant was advised of his *Miranda* rights, which he waived, and was then questioned by the

1. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States declared that an accused has a fifth and fourteenth amendment right to have counsel present during custodial interrogation.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. This charge was dismissed on April 8, 1985.

Pittsburgh police officers. During the course of the questioning, appellant made several inculpatory statements.

On April 8, 1985, troopers from the Pennsylvania State Police presented Washington, D.C. Police Department officials with arrest warrants for Santiago. Thereafter, the Washington D.C. Police Department lodged charges against appellant as a fugitive from justice. Appellant was taken before the local judicial authority where, with the representation of counsel, he waived extradition. That same day, the charge brought against appellant by the federal authorities was dismissed.

Immediately after the federal charges were dismissed, Pennsylvania State Police sought to interview appellant. At that time, appellant was asked to give a videotaped statement. Appellant did not immediately respond to the request. Thereafter, appellant and the state troopers engaged in some conversation as to the possible charges against him. Appellant then asked one of the troopers if he knew how he was going to die; appellant also stated that he deserved to die for what he had done. N.T. 6/18/85 at 55. The troopers explained the possible sequence of events in the prosecution, and, in response to a second request to give a videotaped statement, appellant informed the troopers that he would give a taped statement on the way back to Pennsylvania.

Shortly thereafter, in a second conversation with Santiago, the state troopers asked to speak to appellant concerning the gun which had been used during the commission of the offenses. The troopers also told appellant that it was necessary to advise him of his rights. After being assured that the questioning would only relate to the use of the gun, appellant agreed to talk. He was then given the *Miranda* warnings. Appellant orally waived his *Miranda* rights and proceeded to answer the questions regarding the use of a weapon. While returning to Pennsylvania, appellant refused to make any statement to the troopers but he did indicate that he would give a statement when they reached their destination. Upon their arrival at the State Police

Barracks in New Castle, Pennsylvania, appellant was asked to make a statement and he agreed. After being advised of his *Miranda* rights, which he waived, appellant was interrogated.

Appellant now contends that the inculpatory statements made to the Pittsburgh police officers and the Pennsylvania State Troopers should have been suppressed because they were obtained after he had invoked his rights to remain silent and to consult with an attorney. In support of his argument, appellant contends that the circumstances of this case are similar to those at issue in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (per curiam), *reh'g denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981), and thus, that his inculpatory statements should have been suppressed under the rule of that case.

In *Edwards*, the Supreme Court of the United States held that once an accused has invoked the right to have counsel present during custodial interrogation, further interrogation must cease until counsel has been made available, unless the accused initiates further conversation with the police. *Edwards*, 451 U.S. at 484–485, 101 S.Ct. at 1884–85, 68 L.Ed.2d at 386. *See Commonwealth v. Hubble*, 509 Pa. 497, 504 A.2d 168, *cert. denied, Hubble v. Pennsylvania*, 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *Commonwealth v. Waggoner*, 373 Pa.Super. 23, 37–41, 540 A.2d 280, 287–288 (1988); *Commonwealth v. Petrino*, 332 Pa.Super. 13, 480 A.2d 1160 (1984), *cert. denied, Petrino v. Pennsylvania*, 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). Central to the holding in *Edwards* was the fact that after the accused asserted his right to have counsel present during questioning, the police resumed the interrogation without giving Edwards access to an attorney. Under such circumstances, the Supreme Court concluded that additional safeguards were necessary before an accused may validly waive the right to counsel. *Edwards*, 451 U.S. at 484, 101 S.Ct. at 1884, 68 L.Ed.2d at 386.

■ Although we agree with appellant that *Edwards* is applicable to the present case, we find that case is not

controlling. Instantly, appellant was informed of his rights to remain silent and to have an attorney present immediately upon being arrested by the federal authorities. Appellant exercised his rights and counsel was promptly made available to him. Importantly, however, the police officers from the Commonwealth did not seek to interview appellant until *after* he had consulted with an attorney. In this way, *Edwards* is distinguishable. Unlike the facts before the Court in *Edwards*, appellant was given the opportunity to consult with an attorney after invoking his rights and prior to being interviewed by the police officers from Pennsylvania. Further, unlike the facts at issue in *Edwards*, appellant willingly agreed to speak with the police officers from Pennsylvania; prior to the initiation of any questioning by those officers, appellant was given the *Miranda* warnings, which he waived. Because appellant was given the opportunity to consult with an attorney after being informed of his *Miranda* rights by the federal authorities, and because appellant thereafter agreed to speak with the police officers from Pennsylvania, appellant's statements to the Pennsylvania police officers amounted to a valid waiver and, thus, were admissible.

In the remaining issue before us, appellant asserts that the trial court erred in instructing the jury as to the burden of proving legal insanity and mental illness. The jury instructions in question are as follows:

A defendant must prove insanity defense by a preponderance of the evidence. That is, by the greater weight of the evidence. If the defense is proven, the defendant is entitled to a verdict of not guilty by reason of legal insanity.

\* \* \* \* \* \*

Now, guilty but mentally ill becomes a possible verdict when a defendant offers but fails to prove a legal insanity defense. A jury may return such a verdict when it finds beyond a reasonable doubt that the defendant committed the crime alleged and that the defendant, although

the jury did not find him legally insane, was mentally ill at the time of the crime.

\* \* \* \* \* \*

Legal insanity must be proven by a preponderance of the evidence, while mental illness must be proven beyond a reasonable doubt.

N.T. 9/11/85 at 66, 67, 68–69. Appellant submits that the instructions in question were violative of both the federal and state constitutions. Specifically, appellant claims that the statutory provision for a verdict of guilty but mentally ill, 18 Pa.C.S. § 314, violates due process guarantees by shifting the burden of proof to the accused. For the following reasons we find appellant's claim to be without merit.

Upon review of a challenge to the constitutionality of a statute, we are reminded that a strong presumption exists in favor of the constitutionality of all lawfully enacted legislation. *See Daly v. Hemphill,* 411 Pa. 263, 271, 191 A.2d 835, 840 (1963). The party making such a challenge must demonstrate that the statute in question clearly, palpably and plainly violates the constitution. *Commonwealth v. Doty,* 345 Pa.Super. 374, 387, 498 A.2d 870, 876 (1985), *cert. denied, Doty v. Pennsylvania,* 479 U.S. 853, 107 S.Ct. 185, 93 L.Ed.2d 119 (1986).

It is well established that the Commonwealth carries a never-shifting burden of proving beyond a reasonable doubt all the elements of a crime. *See, e.g., Commonwealth v. Bishop,* 472 Pa. 485, 489, 372 A.2d 794, 796 (1977). Due process requires that the prosecution prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970). A state may, however, impose a "burden of proof" on a criminal defendant in regard to any affirmative defense which relieves the accused of criminal responsibility but does not negate an element of crime. *Commonwealth v. Hilbert,* 476 Pa. 288, 297, 382 A.2d 724, 729 (1978); *Commonwealth v. Shenkin,* 337 Pa.Super. 517, 524, 487 A.2d 380, 384 (1985). Hence, we

must discern whether the statutory provision at issue here improperly shifts the burden to the defendant to disprove any fact essential to the crime charged.

Section 314 of the Crimes Code provides:

**(a) General rule.**—A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, *beyond a reasonable doubt,* that the person is *guilty of an offense,* was *mentally ill* at the time of the commission of the offense and was *not legally insane* at the time of the commission of the offense.

18 Pa.C.S. § 314(a) (emphasis added). Section 315, which deals with the insanity defense provides:

**(a) General rule.**—The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when *the actor proves by a preponderance of evidence* that the actor was legally insane at the time of the commission of the offense.

18 Pa.C.S. § 315(a) (emphasis added). A plain reading of these two statutes makes clear that while an accused bears the burden of proving legal insanity by the preponderance of the evidence, the ultimate burden of proving the elements of a crime beyond a reasonable doubt remains with the Commonwealth. The defendant has only the burden of producing relevant evidence indicating that his state of mind was other than that which is shared by normal reasonable men and women. Such provision is not constitutionally suspect. *See Commonwealth v. Terry,* 513 Pa. 381, 394 n. 14, 521 A.2d 398, 404–405 n. 14, *cert. denied, Terry v. Pennsylvania,* —— U.S. ——, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987). *See also Commonwealth v. Trill,* 374 Pa.Super. 549, 590–594, 543 A.2d 1106, 1127–1128 (1988) (in upholding the constitutionality of Section 314 under equal protection and due process attacks, this Court thoroughly examined and approved of the statutory scheme). Moreover, the Supreme Court has noted that a state's choice of procedures to be used in a criminal proceeding would not be subject to

proscription under the due process clause unless that decision offends some principle of justice so deeply ingrained in the traditions and conscience of the citizenship of the country as to be fundamental. *Patterson v. New York*, 432 U.S. 197, 207, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281, 286–287 (1977). We find no fundamental principle offended by the statutory provisions now in question. By requiring the defendant in a criminal proceeding to prove insanity by the preponderance of the evidence or, alternatively, by requiring that the factfinder find mental illness beyond a reasonable doubt, Sections 314 and 315 of the Crimes Code place the burden of proving the affirmative defense of insanity on the defendant but does not shift the burden to the defendant to disprove any fact essential to the offense charged. Nothing in § 314(a) requires that the accused prove mental illness beyond a reasonable doubt. *See Trill, supra.* *See also Commonwealth v. Johnson*, 373 Pa.Super. 312, 324–326, 541 A.2d 332, 338–339 (1988) (reviewing an application of Section 314(a) upon challenges to the weight and the sufficiency of the evidence).

Likewise, the court's charge to the jury which virtually mirrors the language of Section 314, does not place the burden of proving mental illness beyond a reasonable doubt on the defendant. Rather, the factfinders were clearly advised that the Commonwealth bore the burden of proving beyond a reasonable doubt every element of the crimes charged. *See County Court of Ulster County v. Allen*, 442 U.S. 140, 156, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777, 791 (1979) (in criminal cases the ultimate test of any evidentiary device's constitutional validity in a given case is whether the device undermines the factfinder's responsibility at trial based on evidence adduced by the state, to find the ultimate facts beyond a reasonable doubt). Finding no basis for appellant's due process attack on the constitutionality of Section 314 and, in turn, on the instructions issued to the jury, we affirm the judgment.

Judgment of sentence affirmed.

POPOVICH, J., concurs and dissents with an opinion.

POPOVICH, Judge, concurring and dissenting:

Unlike the Majority, I find that the use of the defendant's confession at trial violated his rights under the Fifth and Fourteenth Amendments as construed in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

Before giving my rationale for the position espoused, I find it necessary to recount the facts. To that end, the suppression hearing transcript reveals that, on April 4, 1985, F.B.I. Special Agents Hosinski and Rasmussen arrested the defendant in Washington, D.C. The arrest was effectuated on the strength of a criminal complaint reproduced over a teletype indicating that the authorities in Pennsylvania were seeking the defendant on homicide charges.

Once the defendant had been transported to the Agents' field office, he was advised of his rights and was asked if he wished to make a statement. His response was: "... no, I would like to have an attorney; I think I should have an attorney." No questions were asked of the defendant; he was merely processed and informed of his rights a second time before being removed to the Metropolitan Police Department for additional processing on the local level, per an understanding between federal and local officials. As a result thereof, the defendant was charged by federal officials with unlawful flight to avoid prosecution, the arraignment on which took place on April 5, 1985, in federal district court. Counsel for the defendant was Attorney Barney J. Keren.

However, because the District of Columbia police charged the defendant on April 8, 1985, with being a fugitive from justice, the equivalent federal charge was dismissed the same day. Also, Attorney Nancy Beiter was appointed counsel for the defendant on April 8 as well. She represented him when he waived extradition in Superior Court and remained in the District of Columbia jail until the proper authorities arrived to remove him to Pennsylvania.

On April 5, 1985, the Pennsylvania State Police were notified by Detective Smith, of the District of Columbia

police, that the defendant was being held by federal officials on fugitive charges. He was aware of Pennsylvania's interest because the defendant was listed in the NCIC computer. However, the State Police did not arrive in Washington, D.C. until April 8. Prior thereto, it appears that the Pittsburgh police were also looking for the defendant to question him regarding the robbery/murder of one Patrick Huber.

Pittsburgh detectives Hedinger and Freeman arrived in Washington, D.C. on April 6 and proceeded to the federal facility housing the defendant. The "shift" commander informed the defendant that there were two officers from Pittsburgh who wanted to question him, but that "he didn't have to speak with [the police] if he didn't want to." Defendant agreed to talk to the police and signed a form to that effect. Next, the detectives advised the defendant of his *Miranda* rights before inquiring about the Huber killing. At this point, the defendant agreed to discuss the matter and, as a result thereof, made incriminating statements concerning the Huber case. Moreover, following the rendition of the *Miranda* warnings a second time, the defendant made inculpatory statements regarding the Lawrence County shooting of Dean O'Hara, a third shooting which occurred in Mercer County and the robbery of a store, all of which transpired in this Commonwealth.

The interrogation of the defendant lasted from 11:14 a.m. to 1:39 p.m. During this time, the detectives never asked the defendant whether he had an attorney. They merely inquired if he wished to speak in the presence of an attorney, to which he answered, "no".

It was not until April 8, 1985, that Pennsylvania State Troopers Holtman and Wherthey made their way to Washington, D.C. They observed the defendant as he stood before a federal magistrate, with counsel present (Attorney Keren) from the public defender's office, being arraigned for unlawful flight to avoid prosecution charges. Once this was completed, the defendant was removed to another room whereupon Troopers Holtman and Wherthey were allowed

to question the defendant concerning the O'Hara homicide. In particular, the troopers informed the defendant of the numerous procedures which would occur upon his return to Lawrence County. During the course of the troopers' discussion with the defendant, they asked whether the defendant would "make a statement and have it put on videotape." The defendant stated: "... he did not want to give a statement while he was in Washington, D.C.... He said, I'll give you a taped statement on the way home."

The defendant was then taken back to the Fugitive Division of the Metropolitan Police Department. Thereafter, the troopers went back to see the defendant. He was advised of his *Miranda* rights and asked whether he would speak to them about the gun used in the homicide. He said, "yes". The remarks made by the defendant indicated he was aware of the weapon used in the shooting and from whose vehicle (the decedent's) it was taken. Prior to the troopers return to Pennsylvania with the defendant, they saw him a third time in the Superior Court for the District of Columbia. This was the extradition hearing where the defendant was represented by Attorney Beiter.

En route from Washington, D.C., the troopers asked the defendant for a statement, and he stated he would give one once they reached New Castle. Upon arrival, the defendant was advised of his rights and indicated he did not want an attorney. Thereafter, he gave a taped statement dealing with the O'Hara murder and the robbery of the store. At the completion of the statement, the defendant received a phone call from the attorney (David Acker, the public defender) assigned to represent him. The defendant was told by counsel not to make any further statements to the police. When this was communicated to the troopers, the questioning of the defendant ceased.

On appeal, the defendant challenges, inter alia, the incriminating statements he made while in custody in Washington, D.C. to the Pittsburgh detectives and the Pennsylvania State Police. He does so on the basis that his request for the appointment of counsel following his arrest on

federal fugitive charges precluded his interrogation thereafter, and he does so on the basis of *Edwards v. Arizona,* supra.

In *Edwards v. Arizona,* the defendant was being questioned by police in regard to a robbery, burglary and murder. Following the rendition of his *Miranda* rights, Edwards agreed to talk and gave an alibi defense. When he was told by police that a suspect in custody had implicate him, he wanted to "make a deal". When the officer informed the accused that he did not have the authority to do so, Edwards told the officer that he wanted an attorney. At this stage, the questioning stopped and Edwards was taken from the police station to county jail.

The next day, two detectives went to speak to the accused. When the detention officer told the accused that he had to talk even though he did not want to, the detectives read him his *Miranda* rights before he agreed to make a statement implicating himself in the crimes.

The Arizona Supreme Court held that albeit the defendant had invoked his rights to remain silent and to counsel, he waived them during the following day's meeting with detectives after the *Miranda* rights were given to the accused. The United States Supreme Court held otherwise by agreeing with Edwards that because he had exercised his right to counsel one day during interrogation, he did not validly waive that right the succeeding day. In the course of so holding, the Court wrote:

> ... we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

communication, exchanges, or conversations with the police.

 *Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, "the interrogation must cease until an attorney is present." 384 U.S., at 474, 86 S.Ct., at 1627. Our later cases have not abandoned that view.

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (Footnote omitted). As noted by the Court in *Edwards v. Arizona,* the cessation of questioning with the invocation of one's Fifth Amendment right to counsel has its roots in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), wherein the Court stated, in clear and mandatory language:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney *and to have him present during any subsequent questioning.* If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474, 86 S.Ct. at 1628 (Emphasis added). Accord *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979); see also *Rhode Island v. Innis,* 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980); *Michigan v. Mosley,* 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975).

 Given the "bright-line" mandate of *Edwards v. Arizona,* when read in conjunction with *Miranda v. Arizona,* our inquiry should be one of whether the defendant's invocation of his right to counsel when questioned by the federal authorities on April 4, 1985, triggered his right to representation during subsequent questioning by the Pittsburgh police on April 6 and the Pennsylvania State Troopers on April 8? I believe it did and look to the remarks in *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) in support of the same. On this exact issue, the United States Supreme Court stated:

*The State maintains that respondents may not have actually intended their request for counsel to encompass representation during any further questioning by the police.* This argument, however, must be considered against the backdrop of our standard for assessing waivers of constitutional rights. Almost a half century ago, in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a case involving an alleged waiver of a defendant's Sixth Amendment right to counsel, the Court explained that we should "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Id.*, at 464, 58 S.Ct., at 1023. For that reason, it is the State that has the burden of establishing a valid waiver. *Brewer v. Williams*, 430 U.S. [387], at 404, 97 S.Ct. [1232], at 1242 [51 L.Ed.2d 424 (1977)]. Doubts must be resolved in favor of protecting the constitutional claim. This settled approach to questions of waiver requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel—we presume that the defendant requests the lawyer's services at every critical stage of the prosecution.[6] We thus reject the State's suggestion that respondents' requests for the appointment of counsel should be construed to apply only to representation in formal legal proceedings.

[6] In construing respondents' request for counsel, we do not, of course, suggest that the right to counsel turns on such a request. See *Brewer v. Williams*, 430 U.S., at 404, 97 S.Ct., at 1242 ("the right to counsel does not depend upon a request by the defendant"); *Carnley v. Cochran*, 369 U.S. 506, 513, 82 S.Ct. 884, 888, 8 L.Ed.2d 70 (1962) ("it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request"). *Rather, we construe the defendant's request for counsel as an extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation.*

475 U.S. at 633 & n. 6, 106 S.Ct. at 1409 & n. 6 (Emphasis added; footnote omitted).

In this writer's mind, the remarks in *Michigan v. Jackson*, when viewed against the backdrop of the facts instantly, militate against any finding that the defendant knowingly and intelligently waived his right to the presence of counsel during his interrogation by Pittsburgh police and

Pennsylvania State Troopers. Once the Fifth Amendment right to counsel is invoked, *Edwards v. Arizona's* "bright-line" rule to safeguard such a right can be waived by the initiation of conversation *by the defendant* and not the police. See *Solem v. Stumes*, 465 U.S. 638, 641, 648, 104 S.Ct. 1338, 1340, 1343, 79 L.Ed.2d 579 (1984). Such was not the case instantly. I find this to be fatal under the teachings of *Miranda v. Arizona* and its progeny, most notably *Edwards v. Arizona*, since the defendant's attorney's function as a " 'medium' between [the suspect] and the State" during interrogation, see *Moran v. Burbine*, 475 U.S. 412, 428, 106 S.Ct. 1135, 1145, 89 L.Ed.2d 410 (1986), was undermined by the actions of the authorities in the face of record evidence that the defendant invoked his right to counsel before the federal authorities. *Accord Arizona v. Roberson*, — U.S. —, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). And, the fact that the Pittsburgh police and the Pennsylvania State Troopers were not cognizant of this is to no avail. In the context of a Sixth Amendment right to counsel case, which I find applicable to this Fifth Amendment issue before us, the United States Supreme Court responded to a similar contention thusly:

> The State points to another factual difference: The police may not know of the defendant's request for attorney at the arraignment. That claimed distinction is similarly unavailing. In the cases at bar, in which the officers in charge of the investigations of respondents were present at the arraignments, the argument is particularly unconvincing. *More generally, however, Sixth Amendment principles require that we impute the State's knowledge from one state actor to another. For the Sixth Amendment concerns the confrontation between the State and the individual. One set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court).*

*Michigan v. Jackson*, supra, 475 U.S. at 634, 106 S.Ct. at 1410 (Emphasis added). In a similar vein, just as in *Michigan v. Jackson*, I see no reason why the federal agents' awareness of the defendant's request for counsel during his

interrogation could not be imputed to the state officials so as to taint their questioning of the accused in the absence of counsel.

Further, I cannot join in that portion of the Majority's Opinion whereby it concludes that, under 18 Pa.C.S. § 314(a), a defendant need prove his mental illness "beyond a reasonable doubt" whereas the defense of legal insanity must be established by a mere "preponderance of the evidence". The Majority offers no justification, be it premised upon law or logic, for the dichotomy, and I can find none since both are affirmative defenses.

As in the circumstances where a defendant is afforded the opportunity to rebut the "intent" element in a charge of murder in the first degree by producing evidence of his intoxication (by a preponderance of the evidence), see *Commonwealth v. White*, 366 Pa.Super. 538, 531 A.2d 806 (1987), should not the same standard prevail in effectuating the intention of the Legislature in promulgating § 314. See *Wharton's Criminal Evidence* § 32 (13th Ed.1972). I would so hold.

In other words, my reading of § 314, in a common sense fashion (1 Pa.C.S. § 1921), would invoke the application of the "preponderance of the evidence" standard to both the "mentally ill" and "legally insane" defenses. See generally *Wharton's Criminal Evidence* § 30 (13th Ed.1972). It would be for the factfinder to determine whether the Commonwealth established the defendant's sanity or absence of mental illness beyond a reasonable doubt. See generally *Commonwealth v. Scarborough*, 491 Pa. 300, 421 A.2d 147, 149 (1980).

To the extent that the Majority would affirm the actions of the trial court in its charge to the jury—mental illness defense need be proven beyond a reasonable doubt by the defendant whereas legal insanity must be proven by a preponderance of the evidence, I dissent and would award the defendant a new trial.

For the reasons herein stated, I respectfully dissent.