## Commonwealth v. Cotto

C.P. of Lancaster County, nos. 1878 and 3167 of 1996.

*Joseph C. Madenspacher, district attorney,* and *Bruce A. Roth, assistant district attorney,* for the Commonwealth.

*Patricia K. Spotts, assistant public defender,* for defendant.

ECKMAN, *P.J.,* May 12, 1997—Defendant, Abraham Martinez Cotto, a juvenile and 15 years of age at the time of the offenses is charged as an adult with six counts of armed robbery[1] and two counts of criminal conspiracy[2] to commit armed robbery.

On April 23, 1996, defendant and two accomplices[3] allegedly used a handgun to rob the owner, an employee

---

1. The Crimes Code, Act of December 6, 1972, P.L. 1482, no. 334, §1, as amended; 18 Pa.C.S. §3701(a)(1)(ii) & (iii).

2. The Crimes Code, *supra,* as amended; 18 Pa.C.S. §903(a)(1) & (2).

3. Antonio Velasquez and another. Information 3167 of 1996.

and two customers of the Mane Magic Beauty Salon at 123 East Clay Street in Lancaster City. Detective Sergeant Kent L. Switzer of the Lancaster City Bureau of Police charged defendant with four counts of robbery and one count of criminal conspiracy on July 29, 1996.

Subsequently, on May 8, 1996, defendant and three accomplices[4] allegedly used a handgun to rob the Parkhill Jewelry Store, its employees, and one customer at 228 North Prince Street in Lancaster City. Detective William J. Chalfant of the Lancaster City Bureau of Police charged defendant with two counts of robbery and one count of criminal conspiracy on May 8, 1996.

On February 28, 1997, defendant filed a motion for transfer proceedings to juvenile court. Defendant contends that since he is a child currently 16 years of age and amenable to treatment, supervision and rehabilitation through juvenile court proceedings and jurisdiction, he should be transferred from adult proceedings to juvenile court for disposition under the Juvenile Act.[5]

Defendant also filed a petition for a writ of habeas corpus on that date to have the "direct file" legislation of the Juvenile Act declared unconstitutional[6] and defendant placed in a juvenile facility. The "direct file" provision permits a juvenile to be charged as an adult when certain criteria are met. Defendant filed a memorandum of law in support of the writ on March 14, 1997 in which he alleges that the "direct file" legislation is unconstitutional because it (1) is void for vagueness

---

4. Alexis Cotto, Eric Javier Zapata and Jose Velasquez. Information 1878 of 1996.

5. The Juvenile Act, Act of July 9, 1976, P.L. 586, no. 142, §2, as amended; 42 Pa.C.S. §6301 et seq.

6. The Juvenile Act, *supra,* as amended; 42 Pa.C.S. §6322.

and (2) places the burden of proof on the defendant. The Commonwealth filed a responsive brief on April 3, 1997.

A hearing on the aforesaid motion and petition was held on March 20, 1997. The motion and the petition are now before the court for disposition. For the reasons discussed *infra,* the motion and the petition are denied.

## MOTION TO TRANSFER PROCEEDINGS TO JUVENILE COURT

The Juvenile Act authorizes the juvenile court to have jurisdiction over children charged with "delinquent acts." 42 Pa.C.S. §6301 et seq.; *In the Interest of R.R.,* 317 Pa. Super. 334, 464 A.2d 348 (1983).

Section 6302 of the Juvenile Act, *supra,* defines "child" as, inter alia, "An individual who: (1) is under the age of 18 years;" and defines "delinquent act," inter alia, as follows:

"(1) The term means an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under federal law, or under local ordinances.

"(2) The term shall not include: . . .

"(ii) Any of the following prohibited conduct where the child was 15 years of age or older at the time of the alleged conduct and a deadly weapon as defined in 18 Pa. C.S. §2301 (relating to definitions) was used during the commission of the offense, which, if committed by an adult, would be classified as: . . .

"(D) Robbery as defined in 18 Pa. C.S. §3701 (a)(1)(i), (ii) or (iii) (relating to robbery). . . .

"(I) An attempt, conspiracy or solicitation to commit . . . any of these crimes, . . . ."

Although these "direct file" offenses initially charge the defendant as an adult if the criteria are met, they may be transferred from criminal court to juvenile court where the transfer serves the "public interest." 42 Pa. C.S. §6322. In particular,

"If it appears to the court in a criminal proceeding charging . . . any of the offenses excluded by paragraph (2)(ii) or (iii) of the definition of 'delinquent act' in section 6302, that the defendant is a child, the case may similarly be transferred [to juvenile court] and the provisions of this chapter applied. In determining whether to transfer a case charging . . . any of the offenses excluded from the definition of 'delinquent act' in section 6302, *the child shall be required to establish by a preponderance of the evidence that the transfer will serve the public interest.* In determining whether the child has so established that the transfer will serve the public interest, the court shall consider the factors contained in section 6355(a)(4)(iii) (relating to transfer to criminal proceedings)." 42 Pa.C.S. §6322(a). (emphasis added)

In determining whether the child has borne his or her burden of proving that the transfer will serve the "public interest," the court is guided by the following factors:

"(A) The impact of the offense on the victim or victims;

(B) the impact of the offense on the community;

(C) the threat to the safety of the public or any individual posed by the child;

(D) the nature and circumstances of the offense allegedly committed by the child;

(E) the degree of the child's culpability;

(F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and

(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:

(I) age;

(II) mental capacity;

(III) maturity;

(IV) the degree of criminal sophistication exhibited by the child;

(V) previous records, if any;

(VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;

(VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors . . . ." 42 Pa.C.S. §6355(a)(4)(iii).

The decision whether to grant an application of a juvenile for transfer to juvenile court is within the sound discretion of the hearing judge, whose decision will not be disturbed absent a gross abuse of his broad discretion. *Commonwealth v. Reed,* 435 Pa. Super. 304, 645 A.2d 872 (1994), *alloc. denied,* 540 Pa. 630, 658 A.2d 794 (1995) (involving a murder charge). An abuse of discretion that will warrant reversal of the trial court's decision "may not merely be an error of judgment, but must be a misapplication of the law or an exercise of manifestly unreasonable judgment based upon partiality, prejudice or illwill." *Id.* at 315, 645 A.2d at 877, quoting *Commonwealth v. Romeri,* 314 Pa. Super. 279, 291, 460 A.2d 1139, 1145 (1983), *affirmed,* 504

Pa. 124, 470 A.2d 498 (1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1922, 80 L.Ed.2d 469 (1984). In the event that the evidence does not affirmatively demonstrate that the accused would likely benefit from the special features and programs of the juvenile court system, and where no special reason exists for sparing him or her from adult prosecution and punishment, jurisdiction would necessarily remain within the criminal court system. *Commonwealth v. Austin,* 444 Pa. Super. 601, 664 A.2d 597 (1995), *alloc. denied,* 544 Pa. 622, 675 A.2d 1241 (1996).

We will address seriatim the factors affecting transfer to determine whether the transfer in the instant case would serve the public interest.

We first consider "(A) the impact of the offense on the victim or victims," *supra.* Both the Parkhill Jewelry Store and the Mane Magic Beauty Salon robberies have had a severe and deleterious impact on the victims. In each of these cases most of the robbers wore masks and at least one had a gun. Even one year after the robberies, Pearl Hesson and Victoria Louise Reist, who were present during the Parkhill Jewelry Store robbery, and Judy Ann Hibshman, a patron at Mane Magic Beauty Salon, all testified that they suffer from nightmares, will not travel to Lancaster City, and are easily frightened by loud noises. (N.D.H. pp. 101-104, 112-13, 116-18, 169.) Mrs. Hesson sought medical attention and was prescribed sedatives, which she chose not to take. (N.D.H. p. 105.) Wendy Bailey, the owner of the Mane Magic Beauty Salon, had a gun pointed to her forehead and was struck in the abdominal area. She was scared and nervous. (N.D.H. pp. 117-18, 126-27.) The work environment at the Parkhill Jewelry Store, in particular, is tense and Bernard Shiffler, the owner, has had to implement increased security measures with their con-

comitant increased costs. (N.D.H. pp. 114, 170-77.) Moreover, Mr. Shiffler testified that at least 10 customers of the Parkhill Jewelry Store have indicated to him that they will not shop there because they are in fear for their personal safety. (N.D.H. p. 180.) Accordingly, the impact on the victims of these robberies has been traumatic and severe.

The second factor involves "(B) the impact of the offense on the community," *supra.* The very nature of an armed robbery increases the community's feelings of insecurity and vulnerability. Such incidents cause people to be fearful of visiting business establishments for fear of being caught in the episode of a robbery, as Mrs. Hesson, Mrs. Reist, Mrs. Hibshman, Ms. Bailey and Mr. Shiffler all testified. These incidents, in effect, take the streets away from ordinary citizens and cause them to be fearful of venturing from their homes. Moreover, armed robbery has a significant commercial impact on a community as evidenced by the fact that Mr. Shiffler, of the Parkhill Jewelry Store, has lost approximately 10 customers and is considering relocating his business outside of Lancaster City. (N.D.H. pp. 177, 180.)

The third factor involves "(C) the threat to the safety of the public or any individual posed by the child," *supra.* Defendant is a threat to the safety of the public and the community in general because he and his co-conspirators allegedly used a firearm to rob two business establishments and their customers. A gun was pointed at the victims, threats were made and Ms. Bailey was struck in the abdominal area. Defendant and his co-defendants created a tense situation in each establishment during which someone could easily have been killed or wounded. In addition, Lynn Anderson, a licensed psychologist hired by defendant, specifically testified that defendant is a "threat to the community"

and, if convicted, should be sentenced to a secure facility, either as an adult or a juvenile. (N.D.H. pp. 8, 96.)

The fourth factor considers "(D) the nature and circumstances of the offense allegedly committed by the child," *supra*. Defendant has been charged with six counts of armed robbery and two counts of criminal conspiracy to commit armed robbery. During the robbery at the Mane Magic Beauty Salon, defendant and his co-defendants allegedly robbed the owner, an employee and two customers of the business by threatening them with a .32 caliber revolver. (N.D.H. p. 137, 141.) To reiterate, one co-defendant allegedly placed the gun to the forehead of Wendy Bailey, the owner of the Mane Magic Beauty Salon, and struck her in the abdominal area. (N.D.H. p. 118.) At the Parkhill Jewelry Store robbery, defendant and his co-defendants again allegedly robbed one customer and the business by using a firearm and threatening the persons present. (N.D.H. p. 132.) Hence, the offenses committed by defendant and the co-defendants were dangerous to the victims and placed the victims at risk to sustain serious or even deadly injury.

The fifth factor involves "(E) the degree of the child's culpability," *supra*. Defendant entered both establishments with the other co-defendants. (N.D.H. p. 168.) Although defendant did not actually carry the handgun, the testimony clearly indicates that he was aware that the gun was used to commit the robberies. (N.D.H. pp. 112-13.) Moreover, Mrs. Hesson identified defendant as the person who robbed her of her purse at Parkhill Jewelry Store after she begged him not to do so. (N.D.H. p. 103.) Defendant was clearly a participant and culpable in the robberies of both establishments.

The sixth factor involves "(F) the adequacy and duration of dispositional alternatives available under this

chapter and in the adult criminal justice system," *supra.* Under the juvenile system, defendant could be detained and supervised until he becomes 21 years of age.[7] In the adult criminal justice system there is no time limitation except as limited by the statutory limits on the offenses committed. The long history of this defendant in the juvenile system shows a complete disregard for prior placements and court ordered services. Defendant refused to attend school and do anything that he was ordered to do. He ran the streets at will, ignored juvenile probation supervision and eventually became involved in these present armed robberies, crimes that have an effect on the entire community. (N.D.H. p. 48.) We believe that it is apparent that defendant is not a proper candidate for continued supervision in the juvenile system because the juvenile system is inadequate to supervise defendant.

Next we consider "(G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile . . .," *supra.*

In making this determination, we must consider the age of defendant. Defendant's date of birth is July 26, 1980. He was 15 years of age at the time of the robberies and is currently 16 years of age. (N.D.H. pp. 18-19.) If transferred to the juvenile system, defendant would be under the court's jurisdiction until July 26, 2001, a period of less than five years, since the jurisdiction of the juvenile court expires at age 21 years, *supra.* Moreover, as a 15-year-old defendant displayed a definite degree of criminal sophistication by his involvement in the two armed robberies where a gun and masks were utilized.

---

7. The Juvenile Act, *supra,* as amended; 42 Pa.C.S. §6302.

In considering defendant's mental capacity, the testimony disclosed that defendant is neither mentally ill nor mentally retarded. (N.D.H. pp. 89-90.) Although defendant has been diagnosed with borderline mental retardation, it does not require him to be institutionalized. (N.D.H. pp. 73, 90.) Mr. Anderson clinically tested defendant in November 1996 and evaluated defendant as having a full-scale intelligence quotient of 77. (N.D.H. p. 32.) In 1991, defendant was found to have a full-scale I.Q. of 89 and on September 6, 1996, a full scale of 73. (N.D.H. pp. 24, 28.)

In considering defendant's level of maturity, both Mr. Anderson and Dr. Nicholas Martino, whose records were used by Mr. Anderson upon stipulation of counsel, found defendant to be emotionally and socially immature. (N.D.H. p. 24.) In addition, though not severe, defendant has an anger control problem. (N.D.H. p. 61.) Defendant, however, is not of such an insufficient level of maturity to negate his ability to understand the crimes that he committed and the possible consequences of his actions. Rather, defendant does understand the charges against him. (N.D.H. pp. 57-58, 90.)

We next consider "the degree of criminal sophistication exhibited by the child," *supra*. Defendant has developed a pattern of being passive-aggressive towards authority. (N.D.H. p. 63, 80.) When faced with an authority figure, defendant is polite, non-combative and respectful. (N.D.H. p. 63, 80.) Away from authorities, however, defendant does not do what is ordered or required of him by the authorities. (N.D.H. p. 63, 80.) In addition, defendant displayed a degree of criminal sophistication beyond his years in these two armed robberies. At an interview with detective William J. Chalfant, defendant asked the detective if he was going

to be charged as an adult. (N.D.H. p. 132.) When defendant learned that he was going to be charged as an adult, he terminated the interview. (*Id.*) Defendant also refused to identify the driver of the vehicle in the Mane Magic Beauty Salon robbery from a photo line-up prepared by Detective Sergeant Kent Switzer. (N.D.H. p. 140.) Lastly, defendant wore a mask to conceal his identity during the robberies, where guns were used to rob and threaten the victims. (N.D.H. p. 104.) We find that defendant exhibited a degree of criminal sophistication considerably beyond his age of 15 years at the time of the robberies.

As to previous records, *supra,* defendant's school records disclose, inter alia, that defendant received four disciplinary reports from his school in 1991,[8] was continually reported for truancy and was eventually withdrawn from the Lancaster City school rolls as an eighth grader in 1995 because of his failure to attend school. (N.D.H. pp. 21, 26, 148.) In 1994, he was convicted of summary retail theft, and in 1995 with criminal trespass, a felony. (N.D.H. p. 36.)

Next we will address "the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child," *supra.* As previously mentioned, defendant was convicted of summary retail theft in 1994 and criminal trespass in 1995. (*Id.*) By all accounts, based on the testimony of Mr. Anderson and Todd Lyons, juvenile probation officer, defendant's level of coop-

---

8. The disciplinary reports were for the following: (1) leaving physical education class without permission, interrupting class, being disrespectful of a teacher; (2) throwing beans during recess and hitting a child in the eye; (3) defacing school property by scratching a wooden wall with a paper clip; (4) using bad language. (N.D.H. p. 26.)

eration with the juvenile probation office was extremely poor. (N.D.H. pp. 37, 74, 148.)

Mr. Lyons testified to the following facts. On the charge of criminal trespass, defendant was placed on informal probation and required to complete 40 hours of community service. (N.D.H. p. 144.) Defendant violated his informal probation, was returned to court and adjudicated a delinquent on May 24, 1995. (N.D.H. p. 145.) Defendant then was placed on formal probation in the school-based program to be supervised by a probation officer at school, ordered to complete 50 hours of community service and ordered to pay costs. (*Id.*) Subsequently, defendant had minimal contact with his school-based probation officer since he refused to either meet with the officer or to attend school. (*Id.*) Defendant did not complete his court ordered community service. (N.D.H. p. 146.) Defendant was returned to court on these violations on December 20, 1995, when he was placed on intensive school-based probation, ordered to perform 60 hours of community service, had his right to apply for a driver's license suspended until the age of 21 or until he completed his community service and ordered to pay costs. (N.D.H. p. 148.) Because he did not satisfy this court order and was uncooperative and unmotivated, defendant was placed on non-supervised status of probation on March 8, 1996. (*Id.*) Defendant was repeatedly truant despite the fact that his probation officer attempted to drive him to school on numerous occasions. (N.D.H. p. 154.) The juvenile probation officer found defendant unmotivated, uncommitted to changing his behavior and inclined to do as he pleased. (N.D.H. pp. 156-61.)

The next issue is "whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction," *supra.* Mr. Anderson testified that it is

unrealistic to think that defendant will finish his education even by age 21. (N.D.H. p. 66.) Furthermore, Mr. Anderson could provide no guarantee that defendant would be rehabilitated by age 21 in the juvenile system. (N.D.H. p. 75.) To reiterate, Mr. Lyons assessed defendant as unmotivated, uncommitted to changing his behavior and bent on doing as he pleased with no parental supervision. (N.D.H. pp. 156-61.) We, therefore, conclude that defendant cannot be rehabilitated by further exposure to the juvenile system.

After carefully considering the above factors, we overwhelmingly are persuaded that defendant has failed to carry his burden of proof by a preponderance of the evidence. Defendant's expert witness, Mr. Anderson, speculates as to whether defendant can be rehabilitated in the juvenile system by the time he reaches 21 years of age. To the contrary, however, there is persuasive evidence from defendant's history that defendant cannot be rehabilitated by the time he becomes 21 years old, and that he will continue to be a threat to society and at considerable risk to injure other persons in the future. Accordingly, we simply are not persuaded that defendant will not be a future threat to society after he reaches 21 years of age and is released from juvenile jurisdiction. We believe that the risk of failure in the juvenile system is too great and we deny the transfer to juvenile court.

## PETITION FOR WRIT OF HABEAS CORPUS

### 1. *Whether the "Direct File" Legislation Is Unconstitutional*

We next address defendant's contention that the "direct file" portion of the Juvenile Act is unconstitutional. Preliminarily, we note that "a legislative enactment enjoys a presumption in favor of its constitutionality and

will not be declared unconstitutional unless it clearly, palpably and plainly violates the constitution." [9] Moreover, the party seeking to have a statute declared unconstitutional has a heavy burden to sustain such a claim. *In re petition to recall the Honorable Gary R. Reese,* 542 Pa. 114, 665 A.2d 1162 (1995).

Defendant argues that the "direct file" provision is void for vagueness and is, therefore, violative of state[10] and federal[11] due process protections.[12] As to vagueness generally, the Superior Court of Pennsylvania stated, as follows:

"A law is void on its face if it is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. . . . In reviewing a void for vagueness challenge, we must consider both the essential fairness of the law and the impracticability of drafting the legislation with greater specificity." *Commonwealth v. Sterling,* 344 Pa. Super. 269, 275-76, 496 A.2d 789, 792 (1985). (citation omitted) A statute is not unconstitutionally vague merely because clearer and more precise language could have been used, and it will not be held invalid on grounds

---

9. The Statutory Construction Act, Act of December 6, 1972, no. 290, §3, as amended; 1 Pa.C.S. §1922(3); *Commonwealth v. Highhawk,* 455 Pa. Super. 186, 197, 687 A.2d 1123, 1128 (1996); *Commonwealth v. Swinehart,* 541 Pa. 500, 664 A.2d 957 (1995).

10. Pennsylvania Constitution Article I, Section 9.

11. United States Constitution Amendment XIV.

12. This vagueness challenge has been rejected by several courts to date. See *Commonwealth v. Allen,* Philadelphia C.P. 96-06-0768 (slip opinion filed November 15, 1996); *In the Interest of Tykee White,* Philadelphia Juv. Pet. 5656-96-09 (slip opinion decided October 4, 1996); see also, *Commonwealth v. Moyer,* 497 Pa. 643, 444 A.2d 101 (1982) (upholding the prior transfer standard and court's refusal to transfer a juvenile to juvenile court against a vagueness challenge).

of uncertainty if it is susceptible of any reasonable construction that will support and give it effect. *Willcox v. Penn Mutual Life Insurance Co.,* 357 Pa. 581, 55 A.2d 521 (1947).

Where a term is not specifically defined by the legislature, the court must apply the rules of statutory construction. *Browning-Ferris Inc. v. Department of Environmental Resources,* 143 Pa. Commw. 243, 598 A.2d 1057 (1991). The objective of statutory interpretation and construction is to ascertain and effectuate the intention of the General Assembly.[13] When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, inter alia:

"(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute." 1 Pa.C.S. §1921(c).

To determine the intention of the General Assembly regarding the definition of "public interest," we must examine the "former law . . . including other statutes upon the same or similar subjects." 1 Pa.C.S. §1921(c)(5).

First, a change in the language of a statute ordinarily indicates a change in the legislative intent. *Masland v. Bachman,* 473 Pa. 280, 374 A.2d 517 (1977). Previously, the Juvenile Act "create[d] a presumption that

---

13. The Statutory Construction Act, *supra,* as amended; 1 Pa.C.S. §1921(a).

the errant juvenile [could] best be supervised, directed and rehabilitated under its provisions absent evidence to the contrary." *Commonwealth v. Greiner,* 479 Pa. 364, 370, 388 A.2d 698, 701 (1978). In the 1995 amendments to the Juvenile Act, the legislature clearly reversed this presumption by requiring a juvenile who met the criteria to be charged with a "direct file offense" as an adult. 42 Pa.C.S. §§6322 and 6302. Therefore, the change in the law indicates that the legislature no longer believed that it is in the "public interest" for juveniles who commit "direct file" offenses to be supervised, directed and rehabilitated under the auspices of the juvenile system.

Second, because there exists a presumption that the General Assembly intends an entire statute to be effective, we must read individual sections not in isolation, but with reference to, and in light of, other sections. *Commonwealth v. Lopez,* 444 Pa. Super. 206, 663 A.2d 746 (1995). Previously, the Superior Court of Pennsylvania has held that when interpreting the Juvenile Act, in particular, each provision should not be read in the abstract, but rather must be construed with a view to its place in the entire legislative structure of the Act. *In the Matter of T.R.,* 445 Pa. Super. 553, 562, 665 A.2d 1260, 1264 (1995) (appropriately, the Juvenile Act falls into that category of legislation that must be construed liberally to effect its objectives and to promote justice).

The term "public interest" of sections 6322 and 6355 is illuminated by sections 6301(b)(2) and 6352 of the Juvenile Act, *supra.* Section 6301(b)(2) previously described the purpose of the Juvenile Act, inter alia, as follows:

"(2) Consistent with the protection of the public interest, to remove from children committing delinquent

acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation."

This section was substantially altered by the recent amendments, to read as follows:

"(2) Consistent with the protection of the *public interest,* to *provide for* children committing delinquent acts *programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community."* (emphasis added)

Section 6352 involves the disposition of a delinquent child and was amended to contain similar language, as follows:

"(a) *General rule.*—If the child is found to be a delinquent child the court may make any of the following orders of disposition determined to be consistent with the protection of the *public interest* and best suited to the child's treatment, supervision, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, *provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community."* (emphasis added)

Accordingly, these Juvenile Act provisions clarify the term "public interest" by no longer focusing solely on the treatment, supervision and rehabilitation needs of the child. The amended sections expand the goals of the Juvenile Act to protect the community and to hold the juvenile accountable for offenses committed.

The term "public interest" is further clarified by reference to the contemporaneous legislative history of the amendments to the Juvenile Act. 1 Pa.C.S. §1921(c)(7). The expansion of the number of offenses for which a juvenile must be charged as an adult and the toughening of the standard relating to the transfer back to juvenile court was a response to a concern by the legislature that the juvenile system could no longer deal effectively with the increasing number of violent crimes committed by juvenile offenders. Senator Fisher described the intention of the legislature in drafting these amendments, as follows:

"I think that as you look across Pennsylvania, when you look at the statistics on crime, both adult and juvenile crime, when you look at the perceptions of the general public across Pennsylvania, people are fed up with violent crime, and they are particularly fed up with violent crime that has been committed and continues to be committed in this Commonwealth by juveniles. The young thugs across this Commonwealth who have held people hostages in their homes and in their streets and in their neighborhoods will come to an end. Hopefully, it will be somewhat abated by the passage of this legislation.

"What this bill does is carries through on a theme that was echoed by Governor Ridge, both as a candidate and in announcing this session, which basically says that if you commit adult crime, you are going to do adult time. . . .

"Under this bill, if a person 15 years of age or older commits that adult crime, they are going to be tried and they are going to be sentenced, whether it be a sentence of imprisonment of five to 10 years, or perhaps even more, to serve the time that is not only going to be rehabilitative but that is going to be the appropriate

punishment for the crime that has been committed." 1995 *Legislative Journal* no. 41, at 227-28 (Statement of Sen. Fisher, June 19, 1995); on the same theme, see also, 1995 *Legislative Journal* no. 61, at 436 (Statement of Rep. Piccolla, October 17, 1995); 1995 *Legislative Journal* no. 57, at 305 (Statement of Sen. Fisher, October 25, 1995); 1995 *Legislative Journal* no. 57, at 305 (Statement of Sen. O'Pake, October 25, 1995).

A transfer back to juvenile court pursuant to 42 Pa. C.S. §6322 is in the "public interest" when, considering all of the criteria enumerated in section 6355, the court is convinced by a preponderance of the evidence that the child is amenable to treatment, supervision, and rehabilitation as a juvenile, that treatment as a juvenile is consistent with the legislature's intent to hold the child accountable for his or her actions and that treatment as a juvenile does not jeopardize the public safety. The "direct file" provision is, therefore, not unconstitutionally vague.

## 2. *Whether Placement of the Burden of Proof on Defendant Is Unconstitutional*

Lastly, we turn to defendant's contention that the "direct file" provision is unconstitutional because it places the burden of proof on the juvenile to prove by a preponderance of the evidence that it is in the "public interest" to transfer the juvenile to juvenile court. 42 Pa.C.S. §6322. As a general rule, constitutional due process requires that the Commonwealth carries a never-shifting burden of proving beyond a reasonable doubt all the elements of a crime. *Commonwealth v. Wagaman,* 426 Pa. Super. 396, 627 A.2d 735 (1993), *alloc. denied,* 536 Pa. 623, 637 A.2d 283 (1993). It is the continuing presumption of innocence which is the basis for the

requirement that the state has a never-shifting burden to prove guilt beyond a reasonable doubt. *Id.*

Where an issue does not relate to the elements of the crime, and therefore does not relate to the presumption of innocence, the burden of proof is not a constitutional, but is an evidentiary matter. See *Commonwealth v. Reilly,* 519 Pa. 550, 563 n.8, 549 A.2d 503, 509 n.8 (1988) (noting, in dicta, that the foundation of a prior Supreme Court case involving the burden of proof for an insanity defense is "purely evidentiary"); see also, *Commonwealth v. Williams,* 463 Pa. 370, 374 n.2, 344 A.2d 877, 879 n.2 (1975). Hence, this principle of a never-shifting burden on the Commonwealth will only be offended where a statutory provision improperly shifts the burden to the defendant to disprove any fact essential to the crime charged. *Commonwealth v. Santiago,* 376 Pa. Super. 54, 545 A.2d 316 (1988), *alloc. denied,* 522 Pa. 595, 562 A.2d 320 (1989), *overruled on other grounds by Commonwealth v. Santiago,* 405 Pa. Super. 56, 591 A.2d 1095 (1991).

There exist numerous circumstances where Pennsylvania courts have held that it is proper for the defendant to carry the burden of proof in certain phases of a criminal prosecution. A state may impose a burden of proof on a criminal defendant in regard to any affirmative defense which relieves the accused of criminal responsibility, but does not negate an element of the crime. *Commonwealth v. Santiago, supra.*[14] An accused

---

14. Cf. *Commonwealth v. Samuel,* 527 Pa. 298, 590 A.2d 1245 (1991) (holding burden on Commonwealth to disprove claim of self-defense); *Commonwealth v. DeWitt,* 530 Pa. 299, 608 A.2d 1030 (1992) (holding burden on Commonwealth to establish by a preponderance of the evidence that challenged evidence is admissible); *Commonwealth v. Heiser,* 330 Pa. Super. 70, 478 A.2d 1355 (1984) (holding burden on Commonwealth to prove at a bail hearing that defendant is not entitled to bail).

bears the burden of proving legal insanity by a preponderance of the evidence, even though the ultimate burden of proving the elements of the crime beyond a reasonable doubt rests with the Commonwealth. The Crimes Code, *supra,* as amended; 18 Pa. C.S. §315(a); *Commonwealth v. Santiago, supra; Commonwealth v. Reilly, supra* at 550, 549 A.2d at 503 (noting that the burden is on the defendant because otherwise sanity would become an implied element of the offense). An individual applying to the court for an order directing an incompetency examination has the burden of establishing incompetency to proceed by a preponderance of the evidence. The Mental Health Act, Act of July 9, 1976, P.L. 817, no. 143, §402, as amended; 50 Pa. C.S. §7403(a); *Commonwealth v. duPont,* 545 Pa. 564, 681 A.2d 1328 (1996). In 1995, the Pennsylvania Supreme Court held that the Commonwealth's death penalty statute does not violate due process by placing the burden of proving mitigating circumstances on the accused. *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90 (1995), *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Instantly, the decision whether to transfer defendant to criminal court based on defendant's burden of proof by a preponderance of the evidence does not relate to the elements of the crime charged. *Commonwealth v. Wagaman, supra.* We find the burden of proof is an evidentiary matter. *Commonwealth v. Reilly, supra.* We, therefore, find that the Juvenile Act is not violative of defendant's constitutional due process rights.

Accordingly, we enter the following

## ORDER

And now, May 12, 1997, for the foregoing reasons, the court hereby denies both the motion to transfer proceedings to juvenile court and the petition for a writ of habeas corpus filed by defendant, Abraham Martinez Cotto.